Clifton G. MOSER and Carlys C. Moser,
Plaintiffs-Appellants,

v.

THORP SALES CORPORATION, Thorp Credit, Inc., Hoth and Willman Real Estate and Auction, Col. Chuck Hoth, Col. Lorenz Willman, Col. Gay Oelke, Richard Schmitt and Marguerite Schmitt, Thorp Finance Corporation of Wisconsin, and ITT Thorp Corporation, Defendants-Appellees.

Charles F. HOTH, Plaintiff-Appellee,

v.

Richard SCHMITT et al.,
Defendants-Appellees.

Richard SCHMITT et al.,
Plaintiffs-Appellees,

v.

THORP SALES CORPORATION and
Lorenz Willman,
Defendants-Appellees.

THORP FINANCE CORPORATION,
Plaintiffs-Appellees,

v.

Richard SCHMITT et al.,
Defendants-Appellees.

No. 2–58974.

Supreme Court of Iowa.

July 29, 1977.

Rehearing Denied Aug. 29, 1977.

Kevin C. Neylan and Kathleen Neylan, Elkader, for appellants.

Richard L. Donohue of Donohue Law Office, P. C., West Union, for appellees Schmitts.

Donald H. Gloe of Miller, Pearson, Gloe & Burns, Decorah, for appellees other than the Schmitts.

Heard by MOORE, C. J., and RAWLINGS, LeGRAND, REYNOLDSON, and McCORMICK, JJ.

REYNOLDSON, Justice.

Plaintiffs, contract purchasers of a 285-acre farm, brought this action in three divisions for specific performance, for decree quieting title, and in the alternative, for damages. Although trial court held the contract was valid and plaintiffs at all times were able to perform their obligations under it, the only relief granted was a judgment requiring defendants to return plaintiffs' down payment, without interest. Plaintiffs appeal. We reverse and remand.

October, 1971, defendants Richard and Marguerite Schmitt, husband and wife, were in possession of this Clayton County farm under a contract of purchase. Foreclosure had been decreed and their right of redemption was about to expire. Apparently Schmitts had listed the property for

sale with defendant Willman. In a zero-hour move, Willman put them in touch with defendant Oelke, an employee of defendant Thorp Sales Corporation.

An arrangement was then made for Schmitts to be refinanced by defendant Thorp Finance Corporation of Wisconsin (hereinafter, "Thorp Finance"). A condition of this arrangement was that Schmitts contract with Thorp Sales Corporation to auction the farm and all of their livestock, crops and machinery. Such a contract was executed October 22, 1971. In this instrument the parties selected defendants Willman, Hoth and Oelke to auction off Schmitts' real and personal property. Thorp Sales was to receive a seven percent commission on proceeds from sale of personal property; a real estate commission was also to be paid.

Thorp Finance took Schmitts' promissory note dated October 27, 1971, due January 15, 1972. It evidenced a loan in the amount of $39,239.18, a service fee of $392.39, predetermined interest in the sum of $1,200.84, making the total note obligation $40,832.41. The annual percentage rate was 18.16 percent. The related security agreement itemized 45 cattle, grain, hay, and a full line of farm machinery. A real estate mortgage encumbering the farm was also executed and delivered by Schmitts.

The auction was set for December 1, 1971. A "Real Estate Auction and Farm Auction" sale bill was captioned in large print "Another Thorp Auction." Several lines below, in print one-fourth the size, Schmitts were listed as owners. This sale bill erroneously listed "Thorp Credit Inc." as clerk, which accounted for that corporation being named defendant in this litigation. There is nothing in this record which discloses Thorp Credit Inc. had any part in the relevant events. The farm was legally described in the bill. The terms were indicated as "20% down on auction date—balance upon merchantable title and closing. Closing and possession on or before January 15, 1972."

On sale date the defendant auctioneers auctioned off the farm. Plaintiffs Mosers,

father and son, lived in the immediate neighborhood and were interested in the property. After the elder Moser tendered bids, the sale was recessed while he went home for his son. The record indicates the Mosers wanted no trouble with the Schmitts, and may have had some fear of Mr. Schmitt. They testified the auctioneers "guaranteed possession" and inferred the Schmitts were "out of it" and had nothing to say about the matter. The elder Moser thought "Thorp" had the mortgage and "it was a foreclosure."

At some point defendant Oelke, Thorp Sales' employee, had a conversation with the elder Moser. Because it helps place in perspective the later conduct of the parties, Oelke's recollection of this incident, found in his direct examination by his attorney at trial, assumes importance:

"Q. Prior to the time that Exhibit B, which has been introduced into evidence here, which is the written agreement signed by Mr. Schmitt and Mr. Moser, prior to it being signed, did you hear anybody announce at the auction sale that Schmitt didn't have anything to do with this? A. Well, its kind of a gray line along that line. I would imagine—I know that either myself or Willman never announced publicly to anybody that we, you know, that we made no definite statement or guaranteeing.

\*     \*     \*     \*     \*     \*

"Q. Did you hear anybody announce at the sale or tell Mr. Moser that Thorp owned this property? A. Well, I might have implied to Mr. Moser that he certainly shouldn't have any problems with any of this real estate transferring because if he [Schmitt] didn't go through with it, he would be faced with another foreclosure and he just got bailed out of one of them, so I couldn't see anybody not completing the whole deal.

"Q. Did you tell him that Thorp owned the property? A. No, I didn't tell him that Thorp owned the property, but I am sure that Thorp did have a first mortgage and we shouldn't have any problems with it, and this is where he probably

interpreted that maybe I had a personal guarantee of some kind, but—"

The two Mosers thereafter made the high bid of $148 per acre, generating a total sale price of $42,180. After the property was struck off to them, defendant Hoth filled in an "offer to buy" which was signed by the Mosers and Schmitts. It contained the sale bill terms and additionally provided sellers were to pay taxes due and payable in 1972. Purchase funds were to be "handled under supervision of Hoth and Willman Real Estate agent." The sellers were to "pay said agents the customary commission." Mosers paid the down payment of $8430.

A settlement scheduled for January 15, 1972, was cancelled because Schmitts were not in position to make good title. Deeds from Schmitts' vendors had not been received. The settlement was rescheduled for February 11, 1972. Mosers were present, ready to perform. The realtors and Oelke were there. Schmitts did not appear.

Willman, Hoth and Oelke went to the farm and talked to Schmitt. Oelke and Schmitt got into an argument. According to Willman, they "pushed each other around for a while." At one point in his testimony Schmitt testified he would have "settled" if Thorp Finance and Thorp Sales had delivered "papers" to him. The inference is these were the promissory note and mortgage releases relating to Schmitts' indebtedness to Thorp Finance. Schmitt also testified he was prejudiced because the failure to consummate the transaction on January 15 prevented him from contracting for another farm he had selected. He apparently blamed his failure to make good title at that time on Thorp Sales.

Oelke recalled Schmitt said Thorp Sales and the realty firm had "violated the contract" because "we didn't close it on the 15th day of January." Schmitt refused to "settle."

At some later point, however, Schmitt went to the Moser farm to discuss renting the buildings on the farm in controversy. But he subsequently failed to vacate and continued to farm the property.

Mosers initially took the position, based on representations made to them at the sale, that "Thorp" had the obligation to remove Schmitts, or at least pay the expense of a specific performance action.

Although Oelke claimed to be employed only by Thorp Sales (a subsidiary of Thorp Finance), the record indicates he had authority to act for the latter corporation. Referring to Schmitts' title he testified, "[W]e had the abstract of title brought up to date 30 or 45 days prior to this matter in order to secure our mortgage * * *." He assured Schmitts there would be no penalty if Thorp Finance had to "wait for their money." About "three days after closing date" he engaged the law firm which represented the Thorp corporations and the realtors throughout this litigation.

On May 1 or 2, 1972, Oelke took the elder Moser to this law office. Oelke testified, "We discussed what we were going to do and the only answer that came out, that if they were going through a foreclosure, this would take a year after that to get, that he [Schmitt] would have the right to redeem it." He recalled Moser was told he had a right to bring a specific performance action.

February 23, 1972, the same law firm filed an action for Thorp Finance against Schmitts. The petition prayed for the court to enter judgment for the balance on the note in the sum of $37,156.16, together with interest and statutory attorney's fee, to foreclose plaintiff's lien on the personal property described in the security agreement, and to foreclose the real estate mortgage on the farm. Mosers were not made defendants.

Schmitts counterclaimed, asserting, *inter alia*, the instruments sued on were signed under duress, it was not necessary to sell all of their property to pay the Thorp Finance indebtedness, the sale was improperly advertised resulting in poor sales results and defendants were "practically put * * * out of business in farming," for which defendants prayed for $12,000 in actual and $25,000 in punitive damages.

June 25, 1973, Thorp Finance and Schmitts stipulated the real estate mort-

gage could be foreclosed, the foreclosure of the personal property was dismissed with prejudice, application for receiver would be held in abeyance until after March 1, 1974, Schmitts would keep the property insured during "the time he is in actual possession of the premises under his right of redemption," and the counterclaim would be "open for future determination." A decree of foreclosure against the real estate was entered July 2, 1973.

Mosers had begun consulting their own lawyers in August, 1972, from which time attorneys for the various parties conducted negotiations. Mosers consistently maintained the position they had purchased the farm and were entitled to it.

August 7, 1973, Mosers read an advertisement for sheriff's sale of the farm pursuant to the Thorp Finance decree. August 27, they filed suit against Thorp Sales, Thorp Credit Inc., Hoth, Willman, Oelke, and Schmitts for damages and specific performance of the December 1, 1971 sales contract. Later, Thorp Finance was made a defendant.

Mosers attempted to enjoin the sale of the property. October 16, 1973, the court enjoined defendants in the specific performance action from "mortgaging, encumbering or conveying the real estate," but refused to enjoin the execution and sheriff's sale in the foreclosure action.

November 29, 1973, Mosers amended their petition by adding division III, an action to quiet title against defendants and unknown defendants and claimants, asserting plaintiffs were the absolute owners. This division prayed for decree quieting title and for "such other and further relief as the court may deem equitable and proper in the premises." The first publication of notice of this action was on December 12, 1973.

December 12, 1973, the sheriff's foreclosure sale was held. On submission of this case, attorney for the Thorp corporations volunteered he attended the sale to bid for Thorp Finance, but when he took the check from his pocket it was drawn on ITT Thorp Corporation. The sheriff insisted the cer-

tificate of sale be made out to the latter corporation. Other evidence disclosed that at time of trial ITT Thorp Corporation owned Thorp Finance.

After numerous motions filed by defendants, plaintiffs were required to recast their petition. This was filed March 4, 1974. The three divisions sought specific performance, damages, and quiet title. Defendants' answers alleged various affirmative defenses, including impossibility of performance, laches, collateral estoppel and equitable estoppel.

Pursuant to a defense motion, the court required Mosers to elect between their remedies. They elected to proceed on the divisions praying for specific performance and quiet title. ITT Thorp Corporation was made a defendant in the quiet title division.

Meanwhile, Hoth apparently sued the Schmitts for real estate commission; the Schmitts sued Thorp Sales and Willman. These cases, as well as Schmitts' counterclaim in the foreclosure action, were all consolidated for trial with this case, these plaintiffs' evidence to be heard first.

Trial was held November 4, 1974, well before the December 12 expiration of the statutory period of redemption in the foreclosure proceeding. At the conclusion of the testimony relating to this controversy, the various defendants dismissed with prejudice the consolidated actions against each other. No decision was forthcoming. The record reflects this delay was due primarily to the illness of the trial judge.

June 5, 1975, Schmitts filed a "Supplemental Brief and Argument" reciting redemption had not been made by Schmitts and that ITT Thorp Corporation had assigned the certificate of sale to Lola Jean Woods who received the sheriff's deed and went into possession. Schmitts therefore asserted the action was moot.

June 16, 1975, decree was entered. Trial court found Mosers would have been entitled to a decree of specific performance as of January 15, 1972 or February 11, 1972, but were guilty of laches and subject to equitable estoppel because they did not in-

tervene in the foreclosure action or earlier commence this action. Trial court held that following the foreclosure action it was impossible to invoke the remedy of specific performance.

The court concluded Thorp Sales and the auctioneers were acting for the Schmitts as disclosed principals in the auction sale, were not bound by the written offer to buy, and any claimed oral contract with them would be too indefinite to enforce. For the same reasons it denied specific performance, the court denied quiet title relief.

Trial court's only reference to the information supplied by the supplemental brief was to state it was not officially aware of what happened to the equity of redemption, but if it was not exercised it would further complicate plaintiffs' position and make granting of relief more difficult and untenable.

The decree ordered the down payment returned to Mosers, made no provision for interest on it, and assessed the costs to Mosers.

Following filing of a new trial motion, Mosers in this action commenced proceedings to have defendants cited for contempt of court for violating the injunction against conveying the property. Although the court severely curtailed Mosers' evidence, the following circumstances appeared.

In October, 1974, before trial, defendants made a settlement of their controversies. Schmitts conveyed their farm interest to Volney Palmer, a banker, as trustee. According to Schmitts' lawyer this was "not for the purpose of avoiding any court order, but for the purpose of trying to dispose of the property in order to complete that settlement by someone who might have some standing, and Mr. Schmitt had sold the farm several times before, and had problems * * *." Schmitts' counsel listed the farm with realtors who sold the property to Lola Jean Woods for $90,000. Out of this sum all defendants were paid. After their lawyer was paid $6,144.02 for services in this proceeding and prior work, Schmitts netted $24,756.76.

The offer to buy executed by trustee Palmer and Woods was dated December 12, 1974, the date of expiration of the statutory right of redemption. It contains the provision, "It is understood and agreed that if seller does not get a title to said property, buyer agrees to accept his money back and this offer shall be null and void." Significantly, however, the assignment of the certificate of sale from ITT Thorp Corporation to Lola Jean Woods is dated October 16, 1974, prior to trial. The Woods' purchase was financed by The Federal Land Bank of Omaha. That bank's representative testified the abstract was examined but the Omaha attorneys "are not guaranteeing the title." Woods as assignee of the certificate of sale was grantee in the sheriff's deed dated December 16, 1974.

Neither the sale to Woods nor the settlement of the other controversies were divulged prior to or during this trial. The only hint of these activities came when defendants dismissed the consolidated actions at the close of evidence concerning this case.

The court refused to find defendants in contempt. Mosers' motion for new trial was overruled.

Mosers' appeal raises several specific issues, most of which are subsumed under their main complaint the "failure of the trial court to grant plaintiffs specific performance and quiet title to the farm real estate * * * was error." They also assert trial court erred in not finding defendants in contempt of court.

■ I. Trial court erred in requiring Mosers to make a pretrial election between the equitable remedies of specific performance and quiet title, and the law remedy of damages. All these remedies were grounded on an affirmance of the real estate contract and were not basically inconsistent. *Stroh Corp. v. K & S Development Corp.*, 247 N.W.2d 750, 753 (Iowa 1976); see *Abdallah v. Abdallah*, 359 F.2d 170, 174 (3d Cir. 1966); 5A Corbin on Contracts § 1222, at 473–475 (1964); 2 Restatement of Contracts § 382, at 715 (1932).

Because of our holding on this appeal, we are not concerned with this error, except to note as the remaining claims are in equity our review is *de novo*. Rule 334, Rules of Civil Procedure; *Janssen v. North Iowa Conf. Pen., Inc. of Meth. Ch.*, 166 N.W.2d 901, 903 (Iowa 1969).

Not only is our review *de novo*, the invocation of equity jurisdiction permits the necessary reach and flexibility in working out the equities among these parties. See *Holi-Rest, Inc. v. Treloar*, 217 N.W.2d 517, 527 (Iowa 1974), quoting from *Holden v. Construction Machinery Company*, 202 N.W.2d 348, 363–364 (Iowa 1972):

"Wherever a situation exists which is contrary to the principles of equity and which can be redressed within the scope of judicial action, a court of equity will devise a remedy to meet the situation, though no similar relief has been given before. McClintock on Equity, § 29 at 76 (2d ed. 1948)."

See also *Bankers Surety Co. v. Linder*, 156 Iowa 486, 494, 137 N.W. 496, 499 (1912) (" * * * the power of a court of equity is not limited to settling the rights of the parties upon what has been done in the past, but it reaches forth and declares their duties and rights for the future * * * "); 65 Am.Jur.2d Quieting Title § 2, at 142 (" * * * in quiet title suits, as in all equity suits, chancery jurisprudence has no immutable rules, but lights its own pathway, blazes its own trail, paves its own highway; it is, in short, an appeal to the conscience of the court"); 71 Am.Jur.2d Specific Performance § 210, at 268 ("Once the jurisdiction of equity has attached in an action for specific performance, it will itself proceed to round out the whole circle of the controversy, and decide every other contention connected with the subject matter of the suit essential to do complete justice.").

■ We review this case in light of our rule that specific performance is available when the contract involves property which is unique or possesses special value. *Severson v. Elberon Elevator, Inc.*, 250 N.W.2d 417, 423 (Iowa 1977). Real estate is assumed to possess this necessary quality.

*Dee v. Collins*, 235 Iowa 22, 24, 15 N.W.2d 883, 885 (1944). The record in this case discloses this neighborhood farm had a unique value to the Moser father-son farm operation.

With the above principles in mind, we turn to a consideration of the district court's decree.

II. We concur in trial court's finding and conclusion Mosers had a valid and enforceable contract to buy the Schmitt farm.

■ Mosers contend the contract was by virtue of the auction and thereby, in some manner not made clear in their pleadings, proof or brief, bound Thorp Sales, Thorp Finance, and the auctioneers, as well as the Schmitts, to perform the contract.

We agree the sale bill and consequent auction, bidding, and down payment constituted an enforceable contract, and the "offer to buy" was a memorial of that agreement. See *Severson v. Elberon Elevator, Inc.*, supra, 250 N.W.2d at 421. But Thorp Sales and the auctioneers were operating as agents for disclosed principals. As such, they incurred no liability on the sales contract. See *Barrett v. Rumeliote*, 256 Iowa 1, 6, 126 N.W.2d 322, 325 (1964); 7 Am.Jur.2d Auctions and Auctioneers § 65, at 277 (1963). Despite heavy emphasis on "Thorp" in the auction sale bill, we find Mosers could not have reasonably concluded Thorp Sales owned the farm.

While the representations made by Oelke came perilously close to an affirmative and separate agreement to see that Schmitts performed under the sales contract, we agree with trial court that only Mosers and Schmitts were bound by the agreement.

■ III. We may summarily dispose of defendants' contention the foreclosure action was res judicata as to any rights the Mosers had in the farm, and that they are collaterally estopped from asserting any claim to the real estate. Prerequisites to the use of collateral estoppel are identified in *Bertran v. Glens Falls Insurance Company*, 232 N.W.2d 527, 533–534 (Iowa 1975) and *Goolsby v. Derby*, 189 N.W.2d 909, 913–917 (Iowa 1971). Here the principle is

sought to be invoked against a non-party to the prior action on an issue neither essential to nor litigated in that proceeding. This contention has no merit.

We infer Mosers were not made parties to the foreclosure litigation because at the outset Thorp Finance felt an obligation to the Mosers and did not view their respective interests as adverse. At a later date when Schmitts' accrued interest and unpaid principal exceeded the Mosers' farm purchase price this viewpoint apparently changed.

IV. Defendants pleaded and argued Mosers lost their right to specific performance of their contract through equitable estoppel, laches, and impossibility of performance, concepts trial court adopted in denying Mosers any relief.

■ Laches and equitable estoppel are affirmative defenses. See *Manson State Bank v. Diamond*, 227 N.W.2d 195, 200 (Iowa 1975); *Chadek v. Alberhasky*, 253 Iowa 32, 39, 111 N.W.2d 297, 301 (1961). The party asserting the defense has the burden to establish all essential elements thereof by clear, convincing and satisfactory proof. See *DeWall v. Prentice*, 224 N.W.2d 428, 430–431 (Iowa 1974).

■ The doctrine of laches will be applied only where it would be inequitable to permit recovery or is clearly demanded in the interests of justice. *Shives v. Niewoehner*, 191 N.W.2d 633, 637 (Iowa 1971). Ordinarily laches cannot be claimed against one bringing an action within the statute of limitations, absent some special detriment to another. *Id.*; see *Chadek v. Alberhasky*, supra, 253 Iowa at 40, 111 N.W.2d at 301; *Pap v. Pap*, 247 Iowa 371, 383, 73 N.W.2d 742, 749 (1955).

The closely related doctrine of equitable estoppel is founded upon a principle articulated at 28 Am.Jur.2d Estoppel and Waiver § 27, at 627, adopted by this court in *S & M Finance Co. Fort Dodge v. Iowa State Tax Comm'n*, 162 N.W.2d 505, 510 (Iowa 1968):

"[A] party who knows or should know the truth is absolutely precluded * * * from denying, or asserting the contrary

of, any material fact which, by his words or conduct, affirmative or negative, intentionally or through culpable negligence, he has induced another, who was excusably ignorant of the true facts and who had a right to rely upon such words or conduct, to believe and act upon * * *."

See also *Manson State Bank v. Diamond*, supra, 227 N.W.2d at 201; *DeWall v. Prentice*, supra, 224 N.W.2d at 430.

■ Still another concept well established in our law has obvious application in the circumstances before us. Parties whose misleading tactics, concealments, misrepresentations and defaults exacerbate the situation cannot invoke estoppel and laches. *DeWall v. Prentice*, supra, 224 N.W.2d at 431; *Holden v. Construction Machinery Company*, supra, 202 N.W.2d at 356.

■ We find defendants fell far short in producing evidence upon which laches or equitable estoppel could be based. At no time did Mosers ever indicate they were releasing their contract. Defendants continued to keep their down payment. Mosers' delay in filing suit was partially caused by their conviction "Thorp" should pay for the litigation—an altogether understandable position in view of Oelke's representations at the auction and their confusion by the several Thorp corporations.

It is true the elder Moser confessed he was "a little bit allergic to lawyers." Although this not uncommon malady is often viewed with impatience by attorneys and sometimes by judges, it furnishes no basis in these circumstances for denying Mosers relief.

Any delay here was no detriment to the Schmitts, who continued in possession and their farming operation. Of all the defendants, only Thorp Finance seriously contends it was prejudiced. This corporation asserts it was required to pay the expense of foreclosure. Of course, Mosers did not default on the Thorp Finance note, Schmitts did. Thorp Finance was paid in full with a large sum for interest together with one-half of the statutory attorney's fee as provided by

its stipulation with Schmitts. Assuming Thorp Finance had the necessary standing to invoke the equitable estoppel defense, we find this corporation did not incur such prejudice as would entitle it to relief under that doctrine.

We hold neither laches nor equitable estoppel defenses were available to deny Mosers equitable relief in this action.

V. We therefore turn to trial court's third ground for denying Mosers relief—impossibility of performance. Trial court concluded "the fact of the foreclosure decree, the foreclosure sale, the altering of the position of the defendants because of that fact, the consequent tax and interest accumulations and mortgage foreclosure and allied costs, would render the decreeing of specific performance equitably unjust, if not impossible to enforce, and would disregard the previous decree of the court in the mortgage foreclosure proceeding."

■ Impossibility of performance of course may be a reason for denying the remedy of specific performance. See *Casady v. Scallen*, 15 Iowa 93 (1863); 81 C.J.S. Specific Performance § 14, at 438 (1953); 2 Restatement of Contracts § 368, at 669 (1932); 11 Williston on Contracts § 1422, at 754 (1968); compare, 81 C.J.S. Specific Performance § 26, at 468 (specific performance may be enforced against a vendor notwithstanding he had, in the meantime, sold and conveyed to a third party who had notice of the prior contract).

Trial court's holding was in part based on the theory Mosers' rights were somehow terminated in the foreclosure proceeding: "Plaintiffs' apparent position was that they did not have to worry about their right to redemption because of their agreement with defendants Schmitt. This unfortunately overlooks the rights of a third party, Thorp, and the now realty [sic] of Thorp's successful foreclosure." Trial court found the foreclosure was valid and that the Mosers were not necessary parties, relying on *Equitable Life Ins. Co. of Iowa v. Condon*, 233 Iowa 567, 10 N.W.2d 78 (1943).

*Condon* was an action to quiet title brought by an owner in possession under a sheriff's sale and deed pursuant to a mortgage foreclosure. The defendant grantee of the mortgagor insisted she could be deprived of her rights only by statutory foreclosure. The *Condon* court held this was not required, but nonetheless recognized the quiet title action as "an equitable proceeding securing to one, who, having been deprived of her day in court, has the right to come in and under proper procedure secure her right to her interest in the land subject to the conditions under which she bought it." 233 Iowa at 572, 10 N.W.2d at 81–82. The court affirmed the allowance of a full year for the grantee to exercise her equitable right of redemption, stating,

"The method pursued in this case has been approved by our court and secures to all parties the rights to which they are entitled. The results obtained are the same as if the original [foreclosure] proceedings are held void as to the defendant and plaintiff required to go through the procedure of additional foreclosure and sale."

—233 Iowa at 574, 10 N.W.2d at 83.

■ Thus under the *Condon* holding the foreclosure action against the Schmitts did not terminate Mosers' interest in the property, as the latter were not made parties to that action.

This equity of redemption accorded to one holding a known interest in the subject property and not named in the foreclosure action has been recognized in the mortgagor's post-mortgage grantee, *Douglass v. Bishop*, 27 Iowa 214 (1869); in the mortgagor's post-mortgage contract vendee, *White v. Melchert*, 208 Iowa 1404, 227 N.W. 347 (1929); and in a junior encumbrancer, *Spurgin v. Adamson*, 62 Iowa 661, 18 N.W. 293 (1883). See *Lincoln Joint Stock Land Bank v. Rydberg*, 234 Iowa 1143, 15 N.W.2d 246 (1944); *Equitable L. Assur. Soc. v. Asmus*, 230 Iowa 1062, 300 N.W. 318 (1941); *Nelson v. First Nat. Bank*, 199 Iowa 804, 202 N.W. 847 (1925); L. Blum, Iowa Statutory Redemption After Mortgage Foreclosure, 35 Iowa L.Rev. 72 (1949); 59 C.J.S. Mortgages § 827, at 1574–1576; Osborne, Mortgages at 626–629 (2d ed. 1970).

Re-examining the circumstances disclosed by this record, it is apparent Mosers cannot now be accorded specific performance in the sense of gaining the full benefit of their land contract. But that does not mean Mosers should not be accorded relief to the maximum extent permitted by the equity concepts and principles set out in Division I, supra. There is little real distinction, in our view, between decreeing specific performance as to the Schmitts and quieting title in the Mosers as against Schmitts.

When Mosers purchased this property, it was encumbered by a mortgage to Thorp Finance. Despite Thorp Sales' questionable part in the auction representations, Mosers made little effort to develop grounds for piercing the corporate veils and disregarding the separate entities of the Thorp organizations. See *Newberry v. Barth, Inc.*, 252 N.W.2d 711, 714 (Iowa 1977). Thorp Finance was not bound by the auction sale contract. Any equitable relief accorded Mosers must therefore take this mortgage into account.

When the foreclosure action was filed, a partial payment had reduced the note indebtedness to $37,156.16 with interest paid to January 15, 1972. At the sheriff's sale on December 12, 1973, the accumulated interest, attorney fees, costs and principal totaled $45,479.14, which was the sum bid by ITT Thorp Corporation. Obviously, Mosers have an equitable right to redeem for this amount. Of course, this sum is more than the $40,832.41 farm purchase price Mosers were to pay. It follows that Schmitts, who refused to perform under their contract at a time when the mortgage could have been paid out of the farm sale proceeds, should be liable to Mosers for the difference if the latter secures the property through exercise of its equity of redemption implemented by court decree.

An equity action to quiet title is available as a vehicle to foreclose outstanding equitable rights of redemption. *Equitable L. Assur. Soc. v. Asmus*, supra, 230 Iowa at 1065, 300 N.W. at 319–320; *Nelson v. First Nat. Bank*, supra, 199 Iowa at 805, 202

N.W. at 847–848. There is no reason to deny the quiet title remedy to equitable owners of real estate, subject to their obligation to exercise such a right of redemption within a reasonable time, with the decree molded accordingly. See § 649.1, The Code; *Bates v. Bates*, 237 Iowa 1408, 1413, 24 N.W.2d 460, 463 (1946) ("The statutes providing for actions to quiet title are remedial in nature and should be liberally construed.").

As this case was submitted to trial court, all interested persons and corporations were parties, including the holder of the certificate of sale, ITT Thorp Corporation. All had notice of Mosers' equitable ownership of the property pursuant to a valid sales contract. Unknown claimants had notice of Mosers' quiet title action by publication. Absent intervening interests of a bona fide purchaser for value without notice, Mosers were entitled to a decree quieting title in them, conditioned upon their exercising their equity of redemption relating to the Thorp Finance mortgage.

VI. This brings us to the issue raised by the assignment of the certificate of sale to Lola Jean Woods and the subsequent sheriff's deed to her.

Although we have said the doctrine of caveat emptor prevails at an execution sale, this rule is applied in the sense there is no warranty of title and the buyer "must examine, judge and test [the title] for himself." *Emmert v. Neiman*, 245 Iowa 931, 935, 65 N.W.2d 606, 608 (1954); see *Martens v. Martens*, 234 Iowa 519, 528, 12 N.W.2d 201, 205 (1943).

Our cases hold a purchaser at an execution sale may nonetheless be a good faith or bona fide purchaser for value without notice. *Keefe v. Cropper*, 196 Iowa 1179, 1182–1183, 194 N.W. 305, 307 (1923); *Rippe v. Badger*, 125 Iowa 725, 727, 101 N.W. 642 (1904); see *Walters v. Walters*, 231 Iowa 1267, 1270, 3 N.W.2d 595, 596 (1942). A bona fide purchaser is one who takes a conveyance of real estate in good faith from the holders of legal title, paying a valuable consideration for it without no-

tice of outstanding equities. *Raub v. General Income Sponsors of Iowa, Inc.*, 176 N.W.2d 216, 219 (Iowa 1970), see § 558.51, The Code. A sheriff's deed is a statutory conveyance and stands upon the same basis as a conveyance by the owner. See *Frum v. Kueny*, 201 Iowa 327, 331, 207 N.W. 372, 374 (1926).

One claiming the protection accorded a bona fide purchaser for value without notice must plead and prove his status as such purchaser. *Kindred v. Crosby*, 251 Iowa 198, 201, 100 N.W.2d 20, 22 (1959).

If the buyer at an execution sale may claim a bona fide purchaser's status, such protection may also be available to the assignee of the certificate of sale who is without notice and pays valuable consideration. See *English v. Otis*, 125 Iowa 555, 560, 101 N.W. 293, 295 (1904).

Examining further the position of Lola Jean Woods, the general rule is that one acquiring an interest in land *pendente lite* is bound by the judgment and decree of court, as though made a party to said action. *Stiles v. Bailey*, 205 Iowa 1385, 1388, 219 N.W. 537, 539 (1928). Where, as here, a petition affecting real estate is filed, it is the duty of the district court clerk to index it in the "tract" index. § 617.10, The Code. When so indexed, the action charges all third persons with notice "and while pending no interest can be acquired by third persons in the subject matter thereof as against plaintiff's rights." § 617.11, The Code; *Rider v. Kelso*, 53 Iowa 367, 370, 5 N.W. 509, 511 (1880); see Marshall, Iowa Title Opinions and Standards, Annotated § 11.1(i), at 227 (1963). If the Clayton County clerk of court performed this duty with respect to this action, the matter is resolved. However, we are not inclined on this appeal to make that assumption. But see *Joneson v. Joneson*, 251 Iowa 825, 830, 102 N.W.2d 911, 913–914 (1960).

There is strong evidence Lola Jean Woods had actual notice of the equitable interest and rights of the Mosers.

The court file in the Thorp Finance foreclosure case is in evidence here. The Mosers' contract of purchase was referred to in affidavits, pleadings and orders filed in that proceeding. See *Norton v. Nebraska Loan & Trust Co.*, 35 Neb. 466, 53 N.W. 481 (1892), aff'd on rehearing, 40 Neb. 394, 58 N.W. 953 (1894). A purchaser at a foreclosure sale is chargeable with notice of such material facts as the record discloses. 55 Am.Jur.2d Mortgages § 780, at 694–695 (1971).

The secret settlements and maneuverings of the defendants in selling the farm to Woods, the differing dates on the assignment of certificate of sale and the offer to buy, the negative title opinion of the lawyers and the money-back reservation in the offer all indicate Woods' knowledge of Mosers' interest. Although the "offer to buy" was apparently signed by the husband of Lola Jean Woods as her agent, she is charged with his knowledge. *McMaken v. Niles*, 91 Iowa 628, 631, 60 N.W. 199, 200 (1894).

While Schmitts insist the above contempt hearing evidence should not be considered, they cite no authority holding a court of equity must ignore evidence produced in a related proceeding in the same case. In any event, Schmitts, having relied on the sale to Woods in their "Supplemental Brief and Argument," are in no position to raise this issue.

Mosers' brief asserts on the same date they brought this action, August 27, 1973, they filed in the Clayton County recorder's office "an affidavit affecting real estate along with a copy of the written instrument signed by Schmitts and Mosers on the date of the auction sale." We find no evidence of this in the record. Such an instrument, if filed under the provisions of § 614.17, The Code, would be ineffective for the purposes of the statute if filed by one not the owner in possession. *Garrett v. United States*, 407 F.2d 146, 150 (8th Cir. 1969); *Tesdell v. Hanes*, 248 Iowa 742, 747, 82 N.W.2d 119, 122 (1957). As the case must be remanded, we merely note such a filing, if proved, might be sufficient to put Woods on inquiry into Mosers' rights in the property under

the rule adopted in *Hayne v. Cook*, 252 Iowa 1012, 1029–1030, 109 N.W.2d 188, 197 (1961), and quoted with approval in *Janssen v. North Iowa Conf. Pen., Inc. of Meth. Ch.*, supra, 166 N.W.2d at 908:

"The rule is well established that to be a good faith purchaser for value, one must show he made the purchase before he had notice of the claim of another, express or implied. It is his burden.

\* \* \*

"It is a general rule announced in 66 C.J.S. Notice § 11, pp. 642, 643, 644, 'that whatever puts a person on inquiry amounts in judgment of law to notice, providing the inquiry becomes a duty, and would lead to a knowledge of the facts by the exercise of ordinary intelligence and understanding. A person who has sufficient information to lead him to a fact is deemed conversant with it, and a person who has notice of facts which would cause a reasonably prudent person to inquire as to further facts is chargeable with notice of the further facts discoverable by proper inquiry. So, wherever facts put a person on inquiry, notice will be imputed to him if he designedly abstains from inquiry for the purpose of avoiding notice. A person must use every reasonable means to ascertain such facts as may be open to his observation, and he must exercise reasonable care to ascertain facts coming to his notice.'"

As bearing further on this question, see *Bartels v. Hennessey Brothers, Inc.*, 164 N.W.2d 87, 94 (Iowa 1969); *Petersen v. Olson*, 253 Iowa 469, 474, 112 N.W.2d 874, 876 (1962); *Siedel v. Snider*, 241 Iowa 1227, 1230, 44 N.W.2d 687, 688–689 (1950).

The general rule is that one intending to buy mortgaged property at the foreclosure sale must examine the title to the property. If he buys without examination, he does so at his peril and must suffer whatever loss is occasioned by his neglect to make the proper examination. 55 Am. Jur.2d Mortgages § 780, at 694–695 (1971).

Although this record strongly reflects Woods was not a bona fide purchaser for value without notice, it is equally apparent

her rights should not be finally adjudicated in a proceeding in which she is not a party.

VII. We reverse and remand this case for further proceedings in conformance with the above opinion and the following directions:

1. Mosers shall have the right, to be exercised within 60 days from the date procedendo is issued from this court, to amend their petition to bring in Lola Jean Woods as a party defendant to division III (quiet title) of their recast petition, as well as any other persons or entities necessary to perfect their title and to obtain possession of the Schmitt farm.

2. Upon supplemental trial below, if the court shall find the interest of a bona fide purchaser for value without notice has not intervened, the court shall quiet title in the Mosers as against all defendants and unknown claimants, upon condition that Mosers shall within 60 days pay into court, as an exercise of their equitable right of redemption, the sum of $45,479.14, without interest. See *Nelson v. First Nat'l Bank*, supra, 199 Iowa at 806–808, 202 N.W. at 848–849; *Teabout v. Jaffray & Co.*, 74 Iowa 28, 32, 36 N.W. 783, 784 (1888). This payment shall be in complete satisfaction of the purchase price for the farm under the sales contract with Schmitts. See *Shell Oil Company v. Kelinson*, 158 N.W.2d 724, 730 (Iowa 1968). Absent evidence her rights have been otherwise protected, Lola Jean Woods shall be regarded as the assignee of the rights of ITT Thorp Corporation and Thorp Finance and entitled to this sum. See *Spurgin v. Adamson*, supra, 62 Iowa at 667, 18 N.W. at 295–296.

3. Neither the Schmitts, the Thorp organizations, nor any other defendant shall be entitled to payment or allowance of any sum representing an increase in value of the farm from the date of the auction. The necessary effect of an executory contract to convey real estate is to give the purchaser the benefit of future appreciation. *Burge v. Gough*, 153 Iowa 183, 186, 133 N.W. 340, 341 (1911).

4. If Mosers elect to acquire the farm by quiet title decree and perform the above condition, the court shall adjust the equities between the Mosers and the Schmitts occasioned by Schmitts' failure to timely perform their sales contract in the same manner as though specific performance had been decreed. See *Chadek v. Alberhasky,* supra, 253 Iowa at 40–41, 111 N.W.2d at 302; *Mitchell v. Mutch,* 189 Iowa 1150, 1153, 179 N.W. 440, 441 (1920); *Spurgin v. Adamson,* supra, 62 Iowa at 667–668, 18 N.W. at 296; 71 Am.Jur.2d Specific Performance §§ 217–220, at 278–287 (1973). The record establishes that to date of trial the reasonable gross rental value of the farm was $5570 for 1972, $6415 for 1973, and $8105 for 1974. This type of evidence, as well as evidence relating to necessary farm ownership expenses, must be updated.

5. Upon payment of the above sum required for redemption, Mosers shall be entitled to judgment against Schmitts for the difference between that amount and the price Mosers agreed to pay for the farm.

6. Upon failure of Mosers to timely amend their petition, bring in new parties, and proceed with their claim to quiet title, or in the event district court on supplemental trial determines the interest of a bona fide purchaser for value without notice has intervened, Mosers are entitled to reinstate in this proceeding their former claim for damages against the Schmitts, as though they had not been required to elect remedies.

7. The district court order adjudging defendants not to be in contempt of court was a final judgment from which appeal was not timely taken. Rule 335, Rules of Civil Procedure. We dismiss this portion of the appeal. Costs in district court in that proceeding are assessed to Mosers.

8. All other costs now accrued in this litigation, both in district court and in this court, are taxed to Richard Schmitt and Marguerite Schmitt.

REVERSED AND REMANDED WITH DIRECTIONS.