**In the Matter of Property Seized from Henry Clay RUSH.**

**Appeal of Henry Clay RUSH.**

No. 88–1040.

Supreme Court of Iowa.

Nov. 22, 1989.

Harlan H. Giese, Jr., Bettendorf, for appellant.

Thomas J. Miller, Atty. Gen., Christie J. Scase, Asst. Atty. Gen., William E. Davis, County Atty., and Gary L. Sissel, Asst. County Atty., for appellee State of Iowa.

McGIVERIN, Chief Justice.

This matter arises from the seizure of certain items of personal property belonging to the claimant, Henry Clay Rush. The district court ruled that the items were used in, intended to be used in, or acquired through Rush's drug trafficking and, therefore, are forfeitable to the State of Iowa under Iowa Code chapter 809 (1987).

On appeal, Rush contends that there is insufficient evidence to establish that the items are forfeitable under chapter 809. Rush also contends that chapter 809 does not authorize the seizure of a cashier's check made payable to him, drawn by and on a Mississippi bank and seized from the U.S. mail at Davenport, Iowa. Rush argues that the funds represented by the check are neither seizable nor forfeitable because the check is drawn on a Mississippi bank and, therefore, seizure of the funds is outside the language of Iowa Code section 809.7, which authorizes seizure of forfeitable property "found within this state [Iowa]." *See* Iowa Code § 809.7.

We reject the argument that chapter 809 does not authorize the seizure and subsequent forfeiture of a cashier's check from an out-of-state bank, where the check itself is seized in Iowa. We also think that the evidence is sufficient to justify forfeiture of the property seized from Rush. Therefore, we affirm the order of forfeiture.

I. *Background facts and proceedings.* On January 21, 1988, officers of the Davenport police department searched Rush's home in Davenport, Iowa. The search was pursuant to a warrant issued after surveillance of the home and the arrest of a visitor to the home, who, after leaving, was found to possess seven packets of heroin. In addition to cocaine, heroin, drug account books, and drug paraphernalia, the search team seized—from various locations inside Rush's home—a Marlin .22 caliber rifle, two small cloth bags containing jewelry, and $250 in food stamps. Over $2500 in cash was seized from Rush's person. Rush was arrested and, at the forfeiture hearing, testified that he intended to plead guilty to a charge of possession of a controlled substance (heroin) with intent to deliver. The criminal proceeding against Rush, of course, is separate from this forfeiture action.

On February 10, the county attorney filed notice of forfeiture of all of the seized property. Acting on information from Rush's probation officer that Rush had admitted to owning an account at Commercial Bank of DeKalb, Mississippi, which contained drug sale proceeds, the county attorney also sought forfeiture of Rush's account at Commercial Bank. The grounds alleged in support of forfeiture were those set forth in Iowa Code section 809.1(2).[1]

About February 22, federal postal officials seized a cashier's check from the U.S. mail at Davenport and turned it over to the Davenport police. The check was drawn by and on Commercial Bank of DeKalb, Mississippi, and made payable to Rush. On its face, the $775.77 check purported to be in settlement of Rush's closed account at Commercial Bank.

On March 1, Rush filed his application for return of some of the seized and forfeited property. In his application, Rush seeks the return of the cash, jewelry, rifle, and food stamps, along with the proceeds of the Mississippi bank account represented by the seized cashier's check. Rush does not seek the return of the drugs, drug account books, or drug paraphernalia seized from his home.

At the forfeiture hearing, the State called several witnesses. Officer Welke of the Davenport police department testified that on January 21, 1988, he received a tip from a confidential informant that Carolyn Roark was going to Rush's home to pur-

---

1. Iowa Code section 809.1(2) (1987) provides:
    2. *"Forfeitable property"* means any of the following:
       *a.* Property which is illegally possessed.
       *b.* Property which has been used or is intended to be used to facilitate the commission of a criminal offense or to avoid detection or apprehension of a person committing a criminal offense.
       *c.* Property which is acquired as or from the proceeds of a criminal offense.
       *d.* Property offered or given to another as an inducement for the commission of a criminal offense.

chase heroin. Welke set up surveillance of Rush's home. Welke observed a woman arrive at and leave Rush's home in a taxi. When the taxi was stopped, the woman was identified as Carolyn Roark. Roark was searched and was found to possess seven tin foil wrapped packets of heroin with a market value, in Welke's opinion, of about $700. Welke then obtained a search warrant for Rush's home, and the warrant was executed shortly thereafter.

Officer Welke testified that he coordinated the search of Rush's home. He observed that the front and rear doors to the home were fortified by accordion-style steel gates on the outside, and the rear door was reinforced on the inside with wooden two-by-fours in metal brackets. Officer Hutcheson of the Davenport police department testified that when the officers knocked on Rush's front door and announced that they had a search warrant, Rush left the doorway of the house and did not open the door. Entrance was initially gained by battering down the fortified rear door.

The search of Rush's home turned up numerous items indicative of narcotics trafficking. The search team found and seized—in various places throughout the house—plastic bags, tin foil, large amounts of then unidentified white powder, and Mennitox, Manitol and Dormin bottles and wrappers. In an upstairs bathroom, the officers found a mixer, a box of foil, scissors, a partially full Dormin bottle, and a plate with two spoons, a razor, and several small pieces of tin foil. The officers found a spice mill in Rush's downstairs bedroom. In a plant near the front door, the officers found both heroin and cocaine. In a downstairs closet, the officers found Rush's coat with two notebooks containing the names and telephone numbers of known drug dealers, with amounts of money written beside the names.

Under Rush's bed, the officers found the two cloth bags containing jewelry, and the rifle, unloaded. In a coffee table ·in the living room, the officers found a bank bag with several of Rush's bank books and the $250 in food stamps. The cash was found on Rush's person, bundled in two wads of $1000 each and one wad of $526. No notebooks, drugs, or drug paraphernalia were found on Rush's person or with the food stamps.

At the hearing, Officer Welke—a twenty-one year veteran officer with special training in drug enforcement—identified the list of property seized from Rush's home. From his experience, Welke opined that the quantity of drugs and money, the other property seized from Rush, and the home's fortification suggested that Rush's house was being used to conduct drug transactions. Mixers, tin foil, plastic bags, and the Mennitox, Manitol and Dormin chemicals seized from the house, for example, are commonly used in the distribution of narcotics. He also testified that jewelry and food stamps are convenient substitutes for cash, and rifles are used to protect the large quantities of drugs and money needed to conduct drug transactions.

Probation officer Francis testified that Rush was one of his probationers. Francis testified that on August 4, 1987, Rush told him that he (Rush) had an account at Commercial Bank in DeKalb, Mississippi and that the money in the account was from drug sales. Francis also testified that about September 1987, Rush told him that he (Rush) had withdrawn the money. On cross-examination, Francis admitted that he had no information about whether other deposits had been made to the account in Mississippi since September 1987. Rush, however, admitted in his testimony that he had made no deposits to the account in the year preceding the hearing.

In his cross-examination of the State's other witnesses, Rush's counsel elicited testimony that except for the tip from the confidential informant, the police had no information about whether Roark might have had the heroin in her possession when she went to Rush's home. The officers admitted that Roark had made no incriminating statements about Rush, and that no separate bundle of money of approximately $700 was found on Rush's person or in his home. Moreover, the State's witnesses admitted that there was no eyewitness or

other evidence that directly linked any of the seized property at issue to a particular criminal offense.

In Rush's case-in-chief, Olay Johnson testified that she had been renting a house from Rush since October 1986 at the rate of $350 per month. She generally paid her rent about the first of every month, in cash.

Letha Knox testified that she lived with Rush. She testified that the food stamps seized by the police belonged to her. She received $141 in food stamps per month, but had been saving about $50 worth per month in order to buy a side of beef. Knox testified that Roark came to the Rush house to pay her (Knox) some money that Roark owed her. When Roark arrived, Knox was asleep but was awakened by her children to receive the money. She testified that as far as she knew, Roark did not pay $700 or even speak to Rush.

Rush testified that the cash taken from his person was not the proceeds of illegal activity, that the Mississippi bank account was a joint account with his mother established for her benefit, that the food stamps belonged to Knox, that he had purchased the jewelry for a Christmas gift, and that the rifle was a gift to him from his father. He testified that he worked part time for a junk business and earned between $175 and $450 per week, depending on how business was going, in cash. A notarized written statement from Rush's employer and friend, Jesse Lewis, was introduced which tended to show that Lewis had been paying Rush about $200 per week since October 1987. Rush also testified that he received $350 per month rental from Knox, as well as disability income. Records were introduced which showed that Rush reported to the federal and state tax authorities income of about $25,000 in 1984, $7,600 in 1985, and $15,800 in 1986, and that he was paid about $8100 in disability income for 1987. Rush also produced a store receipt for two diamond rings he purchased in November 1987. Rush further testified that the $2,526 he possessed at the time of his arrest came from "working and I even borrowed some of it," for the intended purpose of buying a car the following day.

On cross-examination, Rush admitted that, in connection with the events of January 21, 1988, he intended to enter a plea of guilty to a charge of possession with intent to deliver heroin. Rush, however, denied that Roark gave him $700 on the day of his arrest, or that any money in his possession that day was drug sales proceeds. He refused to elaborate on the factual basis of the guilty plea. Rush denied telling probation officer Francis that the Mississippi bank account contained drug sales proceeds.

The trial court found that the State had carried its burden of proving by a preponderance of the evidence that the seized property is forfeitable. The court expressly rejected Rush's testimony, as well as that of his witnesses, as not credible. The court denied Rush's motion for a new trial, reiterating its conclusion that the property at issue was "used or intended to be used to facilitate the illegal purchase and distribution of controlled substances" or was "acquired through illegal drug trafficking."

Rush appealed.

II. *Negotiable instruments and the Iowa forfeiture statute.* Rush's first contention is that regardless of their source or use, the funds represented by the cashier's check drawn on Commercial Bank of DeKalb, Mississippi, are not a proper subject of forfeiture. Rush argues that the seizure of those funds is not authorized by Iowa Code section 809.7 which provides, in relevant part, that "Forfeitable property may be seized whenever and wherever the property is found *within this state* [Iowa]." (Emphasis added.) Because the funds are located in a Mississippi bank, Rush asserts, the Iowa district court "has no jurisdiction over the funds."

The cashier's check was drawn by Commercial Bank, on Commercial Bank, and made payable to Rush. The instrument itself was seized by federal postal authorities from the U.S. mail at Davenport, Iowa, about February 22, 1988. The instrument is in the amount of $775.77 and on its face

purports to be for the purpose of closing Rush's account at Commercial Bank.

Our court of appeals recently explained the nature of a cashier's check. In *Clark v. Hawkeye Federal Savings Bank*, 423 N.W.2d 891, 893–94 (Iowa App.1988), that court stated:

> A "cashier's" check is a check drawn by a bank on itself and made payable to someone else; the bank is both the drawer and the drawee. As a general rule a bank cannot refuse payment of its cashier's check when the check is presented by the payee or a subsequent holder. The issuance of a cashier's check by a bank constitutes an acceptance of the check generally said to extinguish the bank's right to countermand the check.... A cashier's check circulates in the commercial world as the equivalent of cash. People accept a cashier's check as cash because *the bank, not the individual, stands behind it.*

(citations omitted) (emphasis added).

We think that Rush misunderstands the nature of cashier's checks. As suggested by the court of appeals in *Clark*, a cashier's check is the primary obligation of the issuing bank. It is not an item payable from the customer's account. *See id.* at 893–94. Cashier's checks are negotiable instruments within the meaning of the Uniform Commercial Code. *See* Iowa Code § 554.3104; *see also Clark*, 423 N.W.2d at 892; *DaSilva v. Sanders*, 600 F.Supp. 1008, 1010 (D.D.C.1984).

The fact that the drawee on the cashier's check mailed to Rush is a Mississippi bank cannot save the check from seizure and forfeiture. Rush's assumption that the check is the same as his now-closed Mississippi bank account is erroneous; the check is a negotiable instrument backed up by Commercial Bank's funds, not Rush's

funds. In effect, Rush purchased the instrument by closing his account at the bank. It can hardly be questioned that chapter 809 contemplates the seizure and forfeiture of negotiable instruments purchased with drug sales proceeds, where those instruments are seized in Iowa. Chapter 809 does not distinguish between negotiable instruments and other kinds of property. The legislature clearly did not intend to allow drug traffickers to escape forfeiture of their ill-gotten gains merely by converting them into cashier's checks, whether drawn on banks within or without the state of Iowa.[2] The important point is that a cashier's check is a physical object, the rightful holder of which is entitled to payment from Commercial Bank. Because the check was found within Iowa, it may be seized by and forfeited to the State under chapter 809. *See In the Matter of Aronson*, 440 N.W.2d 394, 396 (Iowa 1989).

The cashier's check payable to Rush was seized within Iowa and, by virtue of the trial court's determination that the check was purchased from illegal drug sales proceeds, has effectively been "endorsed" to the State. Rush was divested of his right to the check at the time of its lawful seizure. *See* Iowa Code § 809.6. The State, in substance, is now Rush's payee. We hold that a cashier's check physically present in Iowa may be seized and forfeited to the State under chapter 809, regardless of where the drawee bank is located. An order of forfeiture should have the same effect as an endorsement of the check from the named payee, here Rush, to the State of Iowa.

III. *Review of the sufficiency of the evidence.* Rush's second contention is that the State failed to carry its burden of proving that the property at issue was forfeitable by a preponderance of the evidence. *See* Iowa Code § 809.11(1). The trial court

---

**2.** Iowa Code section 809.1(2) defines "forfeitable property" in the broadest possible terms, simply providing that "any ... property" illegally possessed, or used in or acquired through proscribed means, is forfeitable. *See* Iowa Code § 809.1(2) (1987). The approach of prior law, in contrast, was to enumerate those types of property which were forfeitable under the Controlled Substances Act. *See* Iowa Code

§ 204.505 (1985). Negotiable instruments traceable to, or used to facilitate, a violation of the Act were among the types of property specifically enumerated as forfeitable. *See* Iowa Code § 204.505(1)(f) (1985). By broadening the definition of forfeitable property, we think the legislature foreclosed any argument that negotiable instruments are not forfeitable under our forfeiture law.

ruled that the State had met its burden. In its final ruling, the court stated its conclusion that the property was "used or intended to be used to facilitate the illegal purchase and distribution of controlled substances" or was "acquired through illegal drug trafficking," and ordered the property forfeited to the State. *See* Iowa Code §§ 809.1(2)(b), 809.1(2)(c).

A. *Standard of review.* Our review in forfeiture proceedings is deferential. In *State v. One Certain Conveyance, A 1978 Dodge Magnum,* 334 N.W.2d 724 (Iowa 1983), we reviewed a forfeiture proceeding under Iowa Code section 204.505 and Iowa Code chapter 127 (1981). Those statutes have since been repealed and replaced by chapter 809. *See* 1986 Iowa Acts, ch. 1140, § 19. In *Dodge Magnum,* we stated:

In forfeiture actions we sit to correct errors of law. Forfeiture under chapter 127 is a special proceeding triable to the district court and is not triable de novo on appeal to us.

334 N.W.2d at 725 (citing *State v. One Certain Conveyance, A 1969 Cadillac,* 207 N.W.2d 547, 548 (1973) ("[W]e will not reverse [an order of forfeiture under chapter 127] unless the evidence is utterly wanting to support the conclusion of the trial court.")).

Like proceedings under repealed chapter 127, proceedings under chapter 809 are civil proceedings triable to the court. Iowa Code §§ 809.10(2), 809.11(1) (1987). We see no reason why a different standard of review should apply under chapter 809 than applied under repealed chapter 127. We will, therefore, apply the well-known standard of review for factual findings in an action at law:

[This court will] view the evidence in the light most favorable to sustaining the district court judgment. The trial court's findings are construed liberally in order to support its result. A finding is supported by substantial evidence if it may be reasonably inferred from the evidence. If supported by substantial evidence and justified under the law, the findings are binding on us and the judgment will not be disturbed on appeal....

The possibility of drawing inconsistent conclusions from the same body of evidence does not prevent a finding from being supported by substantial evidence. *C. Mac Chambers Co., Inc. v. Iowa Tae Kwon Do Academy, Inc.,* 412 N.W.2d 593, 596 (Iowa 1987) (citations omitted); *see also Trobaugh v. Hy–Vee Food Stores, Inc.,* 392 N.W.2d 154, 156 (Iowa 1986) ("Evidence is substantial if a reasonable mind would accept it as adequate to reach a conclusion.") (quoting *Iowa State Fairgrounds Security v. Iowa Civil Rights Comm'n,* 322 N.W.2d 293, 296 (Iowa 1982)).

B. *Sufficiency of the evidence.* The question remaining, then, is whether there is substantial evidence to support the district court's ruling that the property at issue was used in, intended to be used in, or acquired through illegal drug trafficking. We must view the evidence in the light most favorable to the State. Direct and circumstantial evidence are equally probative. Iowa R.App.P. 14(f)(16).

Under this view of the evidence, we conclude that the order of forfeiture should be affirmed.

■ The cashier's check seized from the U.S. mail at Davenport was in settlement of a debt Commercial Bank owed Rush that arose when Rush closed his bank account. From the evidence, one can infer that all of the funds in that account were drug sales proceeds. The trial court simply found probation officer Francis' testimony about Rush's admission more credible than Rush's denial of the admission. The credibility of witnesses is a matter within the unique competence of the trial court. Substantial evidence supports the trial court's order of forfeiture of the cashier's check.

■ There is also substantial evidence to support the forfeiture of the cash seized from Rush. From the evidence, one can infer that Roark came to Rush's home to buy heroin. Because she left with a quantity of heroin, it is certainly reasonable to infer that she paid for it. Officer Welke testified that in order to be in the drug business a person needed drugs, packaging materials and large sums of money in order

to complete transactions. The quantity of drugs and drug paraphernalia found in Rush's home, the drug account books found in Rush's coat, the home's fortification, the drugs found on Roark's person, and the large amount of cash found on Rush—who was apparently a man of modest legitimate means—support an inference that Rush was using the cash seized from him to conduct illegal drug transactions. As one court explained under similar circumstances:

> All these facts point to a profitable drug business. To hold that the money seized by the authorities was not "derivative contraband" traceable to the sale of drugs by the [defendant] would be to ignore the realities and to take a myopic view of the case.

*Commonwealth v. Graham*, 334 Pa.Super. 170, 183, 482 A.2d 1277, 1284 (1984) (footnote omitted).

█ Finally, the district court's finding that the food stamps, jewelry and rifle are the fruits or instrumentalities of illegal drug trafficking is amply supported by the circumstantial evidence presented at the hearing. The quantity of drugs and drug paraphernalia found scattered throughout Rush's home, the fortification of the home, the drug account books found in Rush's coat, the drugs found on Roark's person, and the large amount of cash seized from Rush himself all point to a profitable, ongoing drug business being conducted at Rush's home.

With this evidence of ongoing drug trafficking in mind, we think that the circumstances surrounding the discovery of the food stamps, jewelry and rifle betray their true character. The jewelry was found, not stored in a jewelry box or drawer, but hidden in cloth bags under Rush's bed; the rifle was found, not locked in a gun cabinet or even in a gun case, but positioned within convenient reach under Rush's bed; and the food stamps—ostensibly belonging not to Rush but to his girlfriend—were found not kept with her belongings, but stashed in Rush's bank bag with Rush's bank books.[3] The district court expressly found that Rush's testimony, as well as that of his witnesses, was not credible. Substantial evidence supports the order of forfeiture of the food stamps, jewelry and rifle.

The order of forfeiture is affirmed.

AFFIRMED.

All Justices concur except SNELL, J., joined by LAVORATO, J., who concur in part and dissent in part.

SNELL, Justice (concurring in part and dissenting in part).

I concur in the result reached in Division II of the majority opinion that the legal standard was met to forfeit the cashier's check emanating from Rush's bank account in the Mississippi bank. I respectfully dissent from Division III regarding the sufficiency of the evidence to forfeit other personal property.

The trade in illegal narcotics has occasioned great grief for families, caused enormous economic and human waste, resulted in increased crime, and is today one of our most vexing problems nationally and in Iowa. The forfeiture provisions found in our state law are a powerful tool in our effort to stop this despicable criminal activity. The temptation to use this tool is strong, especially when the suspicion is great that the items seized from Rush were in fact related to his apparent involvement in the drug trade. It is precisely because the illegal drug trade is so pernicious and the need to eradicate it imperative that we

---

3. We agree with the State that the manner in which the food stamps, jewelry and rifle were packaged and concealed tends to show that these items were not legitimately owned by Rush. We note, however, that the case relied upon by the State to support the strength of this inference, *United States v. Brock*, 747 F.2d 761 (D.C.Cir.1984), was a federal case in which the government was required to show only probable cause to believe that seized property was forfeitable. The burden then shifted to the claimant to prove by a preponderance of the evidence that the property was not connected to drug trafficking. *See id.* at 762 (citing 21 U.S.C. § 881(d) and 19 U.S.C. § 1615). Thus, federal drug prosecutors bear a significantly lighter burden to justify forfeiture than that burden borne by Iowa drug prosecutors, with whom the risk of nonpersuasion always remains. *See* Iowa Code § 809.11.

should be vigilant in applying the rule of law lest we trample the rights of the innocent while punishing the guilty.

Forfeitures are disfavored in law and in equity. *Chicago R.I. & P.R. Co. v. City of Iowa City*, 288 N.W.2d 536, 541 (Iowa 1980). This court has repeatedly stated that, "In adherence to that rule, forfeiture statutes are to be construed strictly against a forfeiture, with the burden to show full and strict compliance with the statutory procedures upon the party seeking forfeiture." *Jamison v. Knosby*, 423 N.W.2d 2, 5 (Iowa 1988) (citing *Lett v. Grummer*, 300 N.W.2d 147, 149 (Iowa 1981); *Kirkpatrick v. Smith*, 236 Iowa 584, 593, 19 N.W.2d 699, 703 (1945)). This principle of absolute compliance must also apply to the evidence produced. It must be adequate to support the State's burden of proof. I believe the State has failed to meet its burden of proof with regard to several of the items seized.

Our standard of review here should be no different from that applied to any other civil proceeding in which our responsibility is to correct errors of law. *See State v. One Certain Conveyance*, 334 N.W.2d 724, 725 (Iowa 1983). A study of the record is made to determine if the findings by the trial court are supported by substantial evidence. A finding is supported by substantial evidence only if it may be reasonably inferred from the evidence.

While circumstantial evidence is as probative as direct evidence in proving a matter in issue, circumstances must have sufficient probative force to constitute a basis for a legal inference. Circumstantial evidence does not have such probative force when the inference drawn from it is "based on surmise, speculation, or conjecture." *Harsha v. State Sav. Bank*, 346 N.W.2d 791, 800 (Iowa 1984).

The ultimate fact which the State had to prove by a preponderance of the evidence in order for forfeiture to be valid is that the cash, food stamps, jewelry, and rifle were forfeitable property because Rush violated Iowa Code section 809.1(2) (1987). The trial court found that subsection (b) was violated in that these items were "property which has been used or is intended to be used to facilitate the commission of a criminal offense or to avoid detection or apprehension of a person committing a criminal offense." The trial court also found a violation of subsection (c) since these items were "property which is acquired as or from the proceeds of a criminal offense."

The evidence adduced by the State conclusively proved that Rush was a drug dealer. However, the only evidence presented to prove the connection of the specific property items with illegal drug dealings was circumstantial and was woefully weak. It consisted of Officer Welke's testimony that (1) drugs, paraphernalia, and cash are necessary to carry on the drug trade, (2) that jewelry and food stamps are mediums of exchange, and (3) that guns are used for protection by drug dealers. In an attempt to fortify the trial court's findings so that the substantial evidence standard is reached, the majority sees the location of the property in the house as evidence of an illegal source. The majority asserts that jewelry, food stamps, and a rifle not kept where normal law abiding citizens presumably keep such items shows that they were obtained from the illegal drug trade. Although judicial notice is not mentioned, the court must have adopted a new definition of what "everybody knows" since no evidence was presented to connect the location in a house of these items with illegality. Even with the unwarranted assumption that this is more evidence of an illegal drug connection, the standard of proof by substantial evidence to forfeit this property has gone begging.

When we speak of a fact as established by circumstantial evidence, we mean that the existence of it is fairly and reasonably to be inferred from the other facts proved in the case. IA Wigmore, *Evidence in Trials at Common Law* § 25 at 954–55 (Tillers Rev.1983). Admissibility of circumstantial evidence must lead to a reasonable inference, not to a mere suspicion of the existence of facts sought to be proved. *State v. Wesson*, 260 Iowa 331, 149 N.W.2d

190, 192–93 (1967); *see also Wakeley v. State*, 118 Neb. 346, 225 N.W. 42, 45 (1929). To forfeit the cash, jewelry, rifle and food stamps, therefore, the evidence must show they came from an illegal source or were illegally used. None of these items was found near drugs or drug account books. Except for the cash, they were not found on or near Rush's person. Rush testified to having considerable legitimate income over the last few years. The food stamps' value was not large, the jewelry's location does not indicate its use as consideration for drugs and the rifle was not even loaded. The cash on Rush's person greatly exceeded the $700 amount sought to be tied to an illegal drug sale. This cash was not segregated by Rush in any $700 amount. Nevertheless, the State sought forfeiture not of $700, but of all Rush's money. The ethereal connection to a drug sale is obvious; the overreach by the State is gross and tantamount to being punitive.

We should not take a myopic view of drug forfeiture cases nor ignore the realities of this scourge on society. But the myopia occurs in ignoring the requirements for proving the statutory elements for forfeiting property because of overwhelming evidence that the owner is an illegal drug dealer. In so doing, the rule of law is forfeited with the property.