**IN THE COURT OF APPEALS OF IOWA**

No. 14-1936
Filed March 23, 2016

**IN THE MATTER OF THE PROPERTY SEIZED
FOR FORFEITURE FROM SAMANTHA THAO
AND KAREN THAO,**

**SAMANTHA THAO AND KAREN THAO,**
        Appellants.

_____

Appeal from the Iowa District Court for Pottawattamie County, Mark J. Eveloff, Judge.

Samantha Thao and Karen Thao appeal from the district court's order forfeiting currency seized following a traffic stop. **AFFIRMED.**

Mark J. Rater of Rater Law Office, Council Bluffs, for appellants.

Thomas J. Miller, Attorney General, and Bridget A. Chambers, Assistant Attorney General, for appellee State.

Heard by Vaitheswaran, P.J., and Doyle and Mullins, JJ.

**DOYLE, Judge.**

The $69,000 question presented to us on appeal is: Can the State seize cash from people who have not been charged or convicted of a crime?  Under Iowa's statutory forfeiture schema, we conclude the answer is, "Yes."

Specifically, Samantha Thao and Karen Thao appeal from the district court's order forfeiting to the State $58,890.00 from Samantha and $10,700.06 from Karen following a traffic stop and subsequent vehicle search.  They argue the district court erred in finding that the funds were properly subject to forfeiture as proceeds from illegal activity under Iowa Code chapter 809A (2013), among other things.  We affirm.

### I.  Background Facts and Proceedings.

A reasonable fact-finder could find the following facts from the record in this case.  On February 21, 2014, Samantha, traveling from the St. Paul, Minnesota area, was driving through Iowa in a rented Ford Explorer with New York license plates.  Three passengers were in the SUV with her; Karen was in the front passenger seat, and two men were seated in the middle-row seats.

About thirteen miles from the Iowa-Nebraska state line, Pottawattamie County Deputy Sheriff Brian Miller was sitting in his patrol car in the median of I-80 facing westbound traffic.  He observed the SUV traveling westbound in the slow lane, and he believed the vehicle was traveling over the posted speed limit. He also observed that when the driver of the SUV saw the deputy's patrol car in the median, she "immediately dramatically slowed her speed by braking."  The deputy was unable to use radar due to the amount of traffic that was in the immediate area.  He pulled out of the median onto the highway and continued

westbound along I-80 until he caught up with the SUV. By that time, Deputy Miller was near the ten-mile marker, where the speed limit changes from seventy to sixty-five miles-per-hour. He got behind the SUV and, after waiting until the speed limit changed to sixty-five, used his same directional radar. He clocked the speed of the SUV at sixty-eight miles-per-hour. He did not immediately activate his patrol car's emergency lights at that time because the location on I-80 was not particularly safe for a stop, due to guardrails on the sides of the road and then-entering-and-exiting traffic. He ultimately waited until around the eight-mile marker to activate his lights. He did not activate his patrol car's camera until approximately thirty seconds before he stopped the vehicle. From that point, the deputy's body microphone and his patrol car's camera recorded the stop.

The deputy approached the vehicle and spoke to its occupants. While speaking to them, he smelled the odor of marijuana coming from inside the vehicle. He had Samantha get out of the SUV and walk to the back of the vehicle, away from her passengers. He asked her where they were going, and she told him they were going to Omaha to see a sick, male cousin. The deputy told her he smelled marijuana and advised he was going to search the vehicle. Away from Samantha, he asked the vehicle's occupants where they were going and was told they were going to Omaha to visit a sick aunt.

Deputy Miller told the persons in the SUV he was going to search it, and he asked if any of them had guns or knives on them. He was initially told, "No"; however, after he went to the back of the SUV and opened its hatch, one of the men told the deputy there was a Glock 21 pistol in one of the duffle bags. The deputy found three duffle bags; one contained the gun, three fully-loaded

magazines, a marijuana grinder, cigarillos, rolling papers, tips, and a cigarette roller. Another duffle bag contained a vacuum sealer, three plastic bags containing 150 to 300 pre-cut heat-seal plastic bags, and three empty outdoor duffle bags "reek[ing] of the odor of fabric softener." Two small bags with dryer sheets in them were also found.

Additionally, the deputy found a black and white handbag containing an envelope with "10,000" written on it. Samantha confirmed it contained $10,000 and explained it was for "her uncle, because he's sick." After other officers arrived at the scene, Samantha and her passengers were detained and taken to the Pottawattamie County Sheriff's Office. The SUV was fully searched, and in addition to the items described above, marijuana was found where one of the men had been sitting. Under the front passenger seat, the deputy found a plastic grocery bag containing two clear plastic bags full of rubber-banded bundles of currency. Another rubber-banded bundle of currency was found in Samantha's purse.

The four vehicle occupants were interviewed separately by other investigating officers, and each gave inconsistent stories about their travel plans and the purposes of the items and cash found in the SUV. Neither Samantha nor Karen were criminally charged; Samantha was not issued a traffic citation. However, the male passengers were criminally charged for possession of marijuana and drug paraphernalia. Cash totaling $69,590.06 was seized from the SUV.

In March 2014, the State filed in rem forfeiture complaints seeking to forfeit the currency found in the SUV. Samantha and Karen answered and

requested the money be returned to them. A trial in the matter was held in July 2014.

Deputy Miller and two other officers testified, along with Samantha, Karen, Karen's husband, and one of the passengers. Deputy Miller and other officers testified that, based upon their training and experience, they believed the items found together, though legal but for the marijuana, were indicative of a drug operation and evidenced the vehicle's occupants were on their way to purchase and package drugs, which were to be transported back to the St. Paul, Minnesota area for sale.

Samantha denied she was speeding and claimed she actually had $64,000 with her in the SUV from her life savings. She testified she heard the officers say they were going to take five percent of the money found and go to dinner. Samantha stated part of her life savings was an almost $30,000 withdrawal from a 401(k) plan made at the time of her 2008 divorce. She denied telling her interviewer she had withdrawn the money in $2000 increments.

Samantha testified she did not "really understand English much," and though she was actually going to Oklahoma, she told the officer she was going to Omaha because she thought they were the same place. She testified she was going to see her sick uncle and sick aunt, and though she did not know the address, she knew the house and had her uncle's phone number in her cell phone to call him. She testified some of the money was to help pay her sick relatives' medical bills, but the rest of the money she brought with her because she was going to "stay there like a couple of day[s to] a week." She testified that while they were in Oklahoma, they were going to slaughter a cow and some wild

pig, and they brought the vacuum sealer, precut bags for the sealer, and empty duffle bags to fill with the meat. The dryer sheets were in the bags to take away the smell of the meat.

Karen also testified and stated the seized cash came from her tax refund and her savings. She provided her and her husband's 2013 joint tax return, showing they received a refund of $5405. She also provided her husband's January 2014 bank statement for an account, showing two tax deposits of about $6200 and a subsequent withdrawal from the account of $6200. She testified her husband withdrew the money and gave it to her because she is a saver and she pays the household bills. She made him give her the money because he likes to gamble. The same bank statement shows three ATM withdrawals at a casino. Karen's husband testified he withdrew the $6200 from his bank account and gave it to Karen to save for their son's wedding. He also testified she took the money with her because she was afraid he would take it to the casino in her absence.

Finally, one of the passengers testified the marijuana was his and he did not think Samantha knew anything about it, although he agreed he thought the officer could smell marijuana in the vehicle. He told the police they were going to visit a sick aunt, Samantha's "aunt and uncles." He also testified they were going to slaughter a cow and wild boar, so he came along for the ride.

Thereafter, the district court entered its order forfeiting to the State the cash found in the vehicle, finding "that given the totality of the circumstances, the evidence is overwhelming that [Samantha and Karen] were involved in drug trafficking." The court expressly found Samantha was not credible, and it did not

believe Samantha's testimony that the vacuum sealer and other items were going to be used to store meat. Likewise, the court did not believe Karen withdrew the funds because she was afraid her husband would spend it because it had been deposited into her husband's account, to which he had access. The court concluded, based upon the totality of the circumstances, the State proved Samantha and Karen were engaged in criminal activity involving the distribution of marijuana and the money seized was related to that activity.

Samantha and Karen now appeal.

## II. Scope and Standards of Review.

Our review of forfeiture proceedings is for correction of errors at law. *See In re Prop. Seized from Young*, 780 N.W.2d 726, 727 (Iowa 2010). The evidence is examined in the light most favorable to the district court's judgment, and its findings are construed liberally to support the judgment; however, the findings are only binding if we determine they are supported by substantial evidence. *See In re Prop. Seized from Chiodo*, 555 N.W.2d 412, 414 (Iowa 1996). Circumstantial evidence is "equally probative" to direct evidence, *see* Iowa R. Civ. P. 6.904(3)(p), and to be admissible, it "must lead to a reasonable inference, not to a mere suspicion of the existence of facts sought to be proved," *In re Prop. Seized from Rush*, 448 N.W.2d 472, 479 (Iowa 1989) (Snell J., dissenting). Finding a fact is established by circumstantial evidence means "that the existence of it is fairly and reasonably to be inferred from the other facts proved in the case." *Id.* The "possibility that inconsistent conclusions might be drawn from the same evidence does not preclude a finding from being supported by

substantial evidence." *In re Prop. Seized from DeCamp*, 511 N.W.2d 616, 619 (Iowa 1994).

### III. Discussion.

On appeal, Samantha and Karen argue (1) the district court erred in finding that the funds were properly subject to forfeiture as proceeds from illegal activity under Iowa Code chapter 809A[1]; (2) the seizure of their money constitutes excessive fines in violation of their constitutional rights; (3) they are innocent owners, and the money is therefore exempt from forfeiture; and (4) there was no probable cause for the traffic stop. We address their arguments, out of order.

### A. Exemption from Forfeiture and Excessive Fines.

Samantha and Karen both assert they were not involved in any illegal activity and the money seized was therefore exempt from forfeiture under Iowa Code section 809A.5. They also argue the forfeiture of their currency violates the Excessive Fines Clauses of the Iowa and United States Constitutions. They contend error was preserved for our review because they raised these claims in their forfeiture answers and in their written closing arguments they submitted to the district court. However, this is not sufficient to preserve the alleged errors for our review.

Rather, our error-preservation rules require that issues be presented to *and passed upon by the district court* before they can be raised and decided on

---

[1] The general assembly made nonsubstantive, technical amendments to Iowa Code section 809A.3 during its 2013 legislative session, renumbering the subsections and adding paragraphs to section 809A.3. *See* 2013 Iowa Acts ch. 30, § 171. For the sake of convenience, we cite to the renumbered 2013 version of section 809A.3.

appeal.  *See State v. Manna*, 534 N.W.2d 642, 644-45 (Iowa 1995); Thomas A. Mayes & Anuradha Vaitheswaran, *Error Preservation in Civil Appeals in Iowa: Perspectives on Present Practice*, 55 Drake L. Rev. 39, 48 (Fall 2006) (explaining that "[a]s a general rule, the error preservation rules require a party to raise an issue in the trial court and obtain a ruling from the trial court").  "Even issues implicating constitutional rights must be presented to and ruled upon by the district court in order to preserve error for appeal."  *Taft v. Iowa Dist. Ct.*, 828 N.W.2d 309, 322 (Iowa 2013).  Moreover, if the district court fails to make specific findings on an issue raised by a party, a motion to enlarge or amend the court's ruling pursuant to Iowa Rule of Civil Procedure 1.904(2) should be filed for the district court to address the issue.  *See id.* at 323.  These rules are not designed to be hyper-technical, *see Mitchell v. Cedar Rapids Cmty. Sch. Dist.*, 832 N.W.2d 689, 695 (Iowa 2013), but instead exist to ensure that district courts have the opportunity to correct or avoid errors and to provide appellate courts with a record to review, *see State v. Pickett*, 671 N.W.2d 866, 869 (Iowa 2003).

Here, the district court did not address the exemption or excessive-fines claims, and a subsequent rule 1.904(2) motion was not filed seeking the court rule upon the issues.  Consequently, Samantha and Karen failed to preserve any alleged error on the claims, and we do not address them any further.

### B.  Lack of Probable Cause.

Samantha and Karen assert Deputy Miller had no probable cause to stop the vehicle Samantha was driving, and therefore, the fruits of the search should be suppressed.  Samantha points to her testimony that she was not speeding to establish she was not speeding.  Conversely, Deputy Miller testified he clocked

the vehicle going three miles-per-hour over the speed limit.[2] The court found Deputy Miller to be credible and Samantha not credible, and thus, his testimony is substantial to support the determination Samantha was speeding. We also note that though the deputy did not turn his camera on right away, once he did, it showed his speed in the patrol car reaching up to sixty-seven miles-per-hour and steadily following Samantha and Karen's vehicle. Additionally, his consistent statements that he recorded the vehicle traveling over the speed limit, including his statements to Samantha and other officers at the stop-site, support the deputy's testimony.

Deputy Miller stopped the vehicle after he observed a traffic infraction. "[I]t is well-settled law that a traffic violation, no matter how minor, gives a police officer probable cause to stop the motorist."[3] *State v. Hoskins*, 711 N.W.2d 720,

---

[2] Deputy Miller testified he clocked Samantha going sixty-eight in a sixty-five mile-per-hour zone on I-80. At a motion-to-suppress hearing in the men's criminal cases, Deputy Miller testified he had even stopped drivers for going two miles-per-hour or less over the speed limit. He also testified his radar unit had an error rate of plus or minus two miles-per-hour when his vehicle was moving. With that error rate, Samantha could have been actually been going from one to five miles-per-hour over the posted speed limit when clocked. Samantha was not issued a traffic citation or warning.

[3] Even the most trivial traffic infraction or equipment violation gives a peace officer probable cause or reasonable suspicion to stop a motorist. *See, e.g.*, *United States v. Gaffney*, 789 F.3d 866, 868, 870-71 (8th Cir. 2015) (0.8 mile-per-hour over speed limit); *In re Prop. Seized from Pardee*, 872 N.W.2d 384, 386 (Iowa 2015) (burned-out taillight); *State v. Lyon*, 862 N.W.2d 391, 392-95 (Iowa 2015) (rear license plate not illuminated); *State v. Harrison*, 846 N.W.2d 362, 363-69 (Iowa 2014) (license-plate-frame infraction); *State v. Aderholdt*, 545 N.W.2d 559, 563 (Iowa 1996) (dark window tint); *State v. Mitchell*, 498 N.W.2d 691, 692-64 (Iowa 1993) (burned-out taillight); *State v. Hanrahan*, No. 12-0012, 2013 WL 4009675, at *1 (Iowa Ct. App. Aug. 7, 2013) (four miles-per-hour over speed limit). Furthermore, we also note that a 2015 Facebook post on the Iowa DOT Motor Vehicle Enforcement's page suggests that if a motorist does not want to be stopped by law enforcement, the validation sticker on the vehicle's license plate must be placed in the correct location on the plate. *See* Iowa DOT Motor Vehicle Enforcement, *Don't Want to Get Stopped by Law Enforcement?*, Facebook (June 8, 2015), https://www.facebook.com/IowaMVE/posts/1003476763004122; *see also* Iowa Admin. Code r. 761-400.53(1) (stating, but for a few exceptions, "[t]he validation sticker shall be affixed to the lower left corner of the rear registration plate"); *State v. Nguyen*,

726 (Iowa 2006). It matters not that the stop for a trivial traffic infraction or equipment violation is just a pretext to search for drugs. *See State v. Harrison*, 846 N.W.2d 362, 366 (Iowa 2014) ("The motivation of the officer stopping the vehicle is not controlling in determining whether reasonable suspicion existed. The officer is therefore not bound by his real reasons for the stop." (citation omitted)).[4] Consequently, the petty speeding violation here provided Deputy Miller probable cause to stop the vehicle, regardless of his real reasons for the stop. From there, Deputy Miller smelled marijuana in the vehicle, giving him probable cause to believe the vehicle contained contraband and justifying a search under the automobile exception to the warrant requirement under the

---

No. 13-0045, 2013 WL 5498072, at *2-3 (Iowa Ct. App. Oct. 2, 2013) (discussing stop for improper placement of validation sticker).

[4] Out-of-state-plated vehicles from "drug source states" are targeted for pre-textual stops by Iowa State Patrol troopers assigned to criminal interdiction teams patrolling I-80 in eastern and western Iowa. A review by the *Des Moines Register* "of about 22,000 traffic warnings and citations issued by two [Iowa] State Patrol crime-interdiction teams from 2008 to [2012] show[ed] that [eighty-six] percent went to out-of-state motorists," with drivers from California, Colorado, and Illinois, "key states for drug trafficking," receiving "the most warnings and violations"—over thirty percent. Lee Rood, *Patrol Teams Nab More Drivers from Out of State*, Des Moines Reg., Oct. 20, 2013, at 16A. Occupants of such vehicles are automatically suspected of illicit drug or other criminal activity, and the interdiction investigation begins even before the vehicle is pulled over. *See id.*; *see also Pardee*, 872 N.W.2d at 386. As noted above, any minor traffic or equipment violation can support such a stop. *See, e.g.*, *Pardee*, 872 N.W.2d at 386; *see also* Jason Clayworth & Grant Rodgers, *A 'System of Legal Thievery'?*, Des Moines Reg., Mar. 29, 2015, at 1A (discussing stop for five miles-per-hour over speed limit) ("*Thievery*"); Grant Rodgers, *Seized But Not Arrested*, Des Moines Reg., Mar. 29, 2015, at 15A (noting stops of six and five miles-per-hour over the speed limit on I-80); Lee Rood, *Register Investigation: Troopers Nab Out-of-State Drivers*, Des Moines Reg., Oct. 20, 2013, at 16A (discussing stops for three miles-per-hour over speed limit and for dirt on vehicle's license plate). The review also found Pottawattamie, Poweshiek, and Cass Counties to be the top I-80 hot spots for tickets and warnings issued by interdiction teams. *See* Lee Rood, *Here's Where Patrols Write Most Tickets*, Des Moines Reg., Dec. 1, 2013, at 1A. In Iowa State Patrol records in another case, it was revealed that in instances where no traffic offense is noted, out-of-state drivers travelling I-80 are most frequently stopped for window tint and license plate frame infractions. *See In re Prop. Seized from Pardee*, No. 14-0029, 2015 WL 799769, at *1 (Iowa Ct. App. Feb. 25, 2015), *vacated*, 872 N.W.2d at 397.

state and federal constitutions' search and seizure clauses. *See State v. Vance*, 790 N.W.2d 775, 790-91 (Iowa 2010) (Cady, J., dissenting); *State v. Allensworth*, 748 N.W.2d 789, 795 (Iowa 2008). We therefore affirm on this issue.

### C. Subject to Forfeiture.

Iowa Code chapter 809A sets forth Iowa's forfeiture statutes. Forfeitures have long been disfavored under the law and are construed strictly. *See In re Prop. Seized from Williams*, 676 N.W.2d 607, 612 (Iowa 2004); *In re Prop. Seized from Rios*, 478 N.W.2d 870, 872 (Iowa Ct. App. 1991); *State v. Kaufman*, 201 N.W.2d 722, 723-24 (Iowa 1972). Although penal in nature, civil forfeitures are "'designed to do more than simply compensate the Government. Forfeitures serve a variety of purposes, but are designed primarily to confiscate property used in violation of the law, and to require disgorgement of the fruits of illegal conduct.'" *Chiodo*, 555 N.W.2d at 417 (quoting *United States v. Ursery*, 518 U.S. 267, 284 (1996)).

Under Iowa Code section 809A.4(2), all property, but for a few exceptions set out in section 809A.5, is subject to forfeiture if the property is either "[f]urnished or *intended* to be furnished by a person in an exchange that constitutes conduct giving rise to forfeiture" or "[u]sed or *intended* to be used in any manner or part to facilitate conduct giving rise to forfeiture." (Emphasis added.) "Property" is defined as "anything of value." *Iowa Code* § 809A.1(5) Conduct that "may give rise to forfeiture" includes both the criminal act or an act committed in furtherance of a criminal act, if the act is either a serious misdemeanor, aggravated misdemeanor, or felony public offense. *Id.* § 809A.3(1)(a), (c). The State bears the burden to show the relationship

connecting the currency to the crime. *See Rios*, 478 N.W.2d at 872; *see also* Iowa Code § 809A.13(7) (placing "the initial burden of proving the property is subject to forfeiture by a preponderance of the evidence" on the State). Criminal charges are not required under chapter 809A. *See* Iowa Code § 809A.5(2)(b) (providing the owner's property may be forfeited, under that paragraph, whether or not the owner is prosecuted or convicted); *id.* § 809A.12(14) ("An acquittal or dismissal in a criminal proceeding shall not preclude civil proceedings under this chapter."); *In re Prop. Seized from McIntyre*, 550 N.W.2d 457, 460 (Iowa 1996) (holding currency was forfeitable, though McIntyre was not charged with any criminal offense relating to the proceeding, because the "State presented more than a scintilla of evidence connecting the seized property with a drug transaction" and "a reasonable person could conclude that McIntyre's property was used in or derived from a drug transaction"); *see also United States v. 5910 S. Ogden Ct.*, 913 F. Supp. 2d 1037, 1041-42 (D. Colo. 2012) ("An in rem forfeiture proceeding is brought under the 'legal fiction' that property itself is criminally at fault or is the progeny of criminal works. A criminal conviction is not a precondition to a forfeiture proceeding, however, forfeiture proceedings generally involve property that has been subject to, or associated with criminal activity." (internal citations omitted)); 36 Am. Jur. 2d *Forfeitures and Penalties* § 19 ("Under some statutory schemes, a forfeiture action lies whether or not a criminal charge has been brought against the owner of the property seized, though under other forfeiture statutes, a conviction for a criminal offense is required before the property is subject to forfeiture." (internal footnotes omitted)).

Under Iowa Code section 124.401(1),

> it is unlawful for any person to manufacture, deliver, or possess with the intent to manufacture or deliver, a controlled substance . . . or to act with, enter into a common scheme or design with, or conspire with one or more other persons to manufacture, deliver, or possess with the intent to manufacture or deliver a controlled substance.

A person that violates section 124.401 commits at least a serious misdemeanor. *See* Iowa Code § 124.401(1)-(6) (classifying various offenses from a serious misdemeanor to a class "B" felony). Marijuana is one of many substances controlled under chapter 124. *See id.* § 124.204(4)(m). Consequently, even if Samantha and Karen had committed no crime, if their money was intended to be used to purchase and then deliver marijuana, their money would be subject to forfeiture under our current forfeiture statutes.

Samantha and Karen correctly point out that this court has stated that "[d]rug dealers may have large amounts of cash, but this does not mean persons who carry large amounts of cash on their person and have large amounts of cash in their homes are drug dealers," noting "[t]here are a number of people that do not trust banks" and therefore keep cash on hand. *Rios*, 478 N.W.2d at 872. It is also true that a large amount of cash in the possession of a person determined to be a drug dealer "does not alone establish the cash is forfeitable." *Id.* However, we must view the evidence in the light most favorable to the district court's order. So doing, we conclude there was sufficient evidence to support the order. While Samantha and Karen argue the evidence only supports conjecture and speculation, we believe that the court's findings can be reasonably inferred from the evidence and testimony presented and that a reasonable mind would accept the evidence and testimony as adequate to reach the same conclusion.

Here, the officers testified that based upon their training and experience, many of the items found in the SUV, such as the empty duffle bags, the vacuum sealer and the 150 to 300 precut bags,[5] the gun, the dryer sheets, the marijuana, and the large amount of currency, are typically used in drug trafficking. Specifically, Deputy Miller testified:

> Based on my training and experience, the area in which I work in and based upon my training that narcotics go eastbound along 80 and when marijuana is—a large majority of the marijuana that's being transported along I-80 in the State of Iowa are packaged in sealed and vacuum-sealed containers. They are then since smuggled, a majority of the time, in duffle bags. Obviously, this is a westbound case but it represents everything that I had found and discovered during my probable cause search. Since there was a large amount of currency, there was numerous bags—vacuum-sealed bags, there was marijuana and the means to package and to transport narcotics, it made me believe that all the individuals inside this vehicle were going to a destination to package a large amount of narcotics, themselves, and place those narcotics in those duffle bags and use the vacuum sealer, which was located inside the vehicle to seal those bags and to transport those narcotics, along with the narcotics that they were already in possession with, back to the St. Paul area to distribute and to profit from, I believe, to them to be involved in drug smuggling.

Additionally, the deputy testified the large amount of currency found, particularly the way it was bundled, separated, stored, and hidden, without any receipt or other documentation, was common in drug trafficking. Specifically, he testified:

> Based on my training and experience, most people carry that carry large amount of currency along the roadway either have a bank receipt or attached in a bank envelope. It is not bundled in individual bundles. And based upon my training and experience, that a large amount of currency that's bundled in this—in the way in which I had discovered inside the vehicle, made me believe that they were involved in criminal activity.

---

[5] The deputy explained: "Vacuum-seal bags come in rolls and you have to cut them to determine the length of the item in which you want to place in those bags before vacuum sealing them."

A special agent testified the items found in the SUV are items seen in narcotics trafficking, explaining:

> Specifically duffle bags. We seize a ton of marijuana usually in duffle bags. It's a lot more common that it's packaged in duffle bags than any other thing we've actually ever seized them out of.
> Dryer sheets are another common thing that we also see. They haven't—the individuals involved in narcotics trafficking seem to think that dryer sheets will either inhibit the dogs for hitting on it or actually inhibit the odor from the marijuana coming out of the bags as well as the heat-sealed bags help conceal the odor of marijuana or think it helps to conceal the odor of marijuana.
> Taking the heat sealer with them. I've had it on several cases where they have everything ready, they get to the location, the people that are actually selling the marijuana will sometimes give them a discount if they decide they're going to package up their own.
> Necessarily, I heard some testimony about a scale not being there. I don't think it's necessary the scale being there. At some point in time, a scale is going to be used more than likely, but they've got all the other things needed except for a scale to pick up what I would consider more than likely it's going to be marijuana.

And further: "I would say if there's one constant denominator of narcotics trafficking, it's dryer sheets. I don't know why. Like I said, if they try to avoid the odor or detection, but we almost always seize dryer sheets, especially when it comes to the seizure of marijuana." The expertise of police officers in drug investigations may be considered when determining if the State presented sufficient evidence. *See State v. Grant*, 722 N.W.2d 645, 648 (Iowa 2006). Any one item, if found by itself—even the minimal amount of marijuana—in the vehicle, would not alone give rise to an inference of drug trafficking. However, when viewing the many items collectively—combined with the inconsistent stories, dubious explanations, and untruthful statements given by the vehicle's occupants—the evidence supports a reasonable inference the cash was

intended to be used for drug trafficking. We therefore find the court did not err in finding the State proved the currency was subject to forfeiture.

### IV. Conclusion.

We recognize that Iowa's forfeiture laws have come under attack in recent years.[6] As unconscionable as property seizures from people who have not been charged or convicted of a crime may seem, it is not our function to change the law. "In a democracy, the power to make the law rests with those chosen by the people.'" *King v. Burwell*, 135 S. Ct. 2480, 2496 (2015). Even if we dislike the law or think some other approach might be a better policy, "[t]he role of [a court] is to apply the statute as it is written." *Burrage v. United States*, 134 S. Ct. 881, 892 (2014); *see also Ackelson v. Manley Toy Direct, L.L.C.*, 832 N.W.2d 678, 687-88 (Iowa 2013) (noting "the legislature makes the law and the courts interpret the law" (citation omitted)). "Ours not to reason why, ours but to read, and apply. It is our duty to accept the law as the legislative body enacts it." *Holland v. State*, 115 N.W.2d 161, 164 (1962); *cf. Moore v. Monroe*, 20 N.W. 475, 475 (Iowa 1884) ("It is the law of the state, unless unconstitutional."). "If changes in a law are desirable from a standpoint of policy or mere practicality, it is for the legislature to enact them, not for the court . . . ." *U.S. Jaycees v. Iowa Civil Rights Comm'n*, 427 N.W.2d 450, 455 (Iowa 1988).[7]

---

[6] *See, e.g.*, Jason Clayworth and Grant Rodgers, *Calls Rise: Reform Forfeiture*, Des Moines Reg., Apr. 5, 2015, at 1A; *Thievery* at 16A; Editorial, *State Lawmakers Off to a Slow Start*, Des Moines Reg., Feb. 21, 2016, at 1OP; Editorial, *Remove the Profit Motive*, Des Moines Reg., Apr. 5, 2015, at 1OP; Editorial, *Iowa Must Stop 'Highway Robbery,'* Des Moines, Reg., Oct. 5, 2014, at 1OP; Editorial, *Lawmakers Need to Fix 'Forfeiture' Law in 2015*, Des Moines Reg., Oct. 19, 2014, at 1OP; Grant Rodgers, *Forfeiture Laws Called Burdensome to Innocent*, Des Moines Reg., Oct. 1, 2014, at 13A.

[7] Senate File 2166, introduced in the 2016 legislative session, would provide that property is not subject to forfeiture unless a person has been convicted of a felony for

Because a speeding violation—even for merely driving three miles-an-hour over the limit—provided probable cause to stop the vehicle, and because the State established the currency was forfeitable under chapter 809A, we affirm the district court's order forfeiting the currency seized.

**AFFIRMED.**

---

which forfeiture is expressly authorized as a penalty. *See* S. Journal, 86th G.A., Reg. Sess. at 215 (Iowa 2016) (introducing S.F. 2166). The bill was assigned to a subcommittee on February 15, 2016. *See id.* at 229. The bill did not make it past the legislative "funnel deadline," but lawmakers agreed to study the issue to develop recommendations for the 2017 legislative session. *See* William Petroski, *Iowa Senate Targets Criminal Asset Forfeiture Law*, Des Moines Reg., Feb. 18, 2016, at 7A.