CHICAGO, ROCK ISLAND AND PACIFIC RAILROAD COMPANY, Appellee-Cross-Appellant,

v.

CITY OF IOWA CITY, and all unknown claimants and all persons unknown claiming any right, title or interest in and to the following described real property situated in the County of Johnson, State of Iowa, to-wit the East 160 feet of a parcel of land known as South Market Square in the City of Iowa City, Iowa, Appellant-Cross-Appellee.

No. 63033.

Supreme Court of Iowa.

Feb. 20, 1980.

Robert H. Bowlin, Iowa City, for appellant-cross-appellee.

James D. Polson and William W. Graham, of Gamble, Riepe, Burt, Webster & Davis, Des Moines, for appellee-cross-appellant.

Considered by REYNOLDSON, C. J., and HARRIS, ALLBEE, McGIVERIN and LARSON, JJ.

HARRIS, Justice.

This dispute between the plaintiff railroad and defendant city is over ownership of land in Iowa City. The question is whether the railroad or the city owns the east half of South Market Square and an easement over a part of the west half of South Market Square. South Market Square is a block located within the city. We adopt as our own the following from the findings of fact of the trial court:

This lawsuit has its origins a century ago when, in 1878, the city enacted ordinance no. 340 perpetually granting to the Burlington, Cedar Rapids & Northern Railway Company right of way within the city and granting the use, perpetually, of South Market Square "on which to erect either a passenger station or stations, or freight depots or both, and on and over which to construct and operate any and all railroad tracks, sidetracks and

switches, which may, in the judgment of said railway company, be or become necessary in constructing and operating the railroad of said company through and using said depot or station grounds in Iowa City."

Section 7 of the ordinance provides: "This ordinance may be repealed and the grants and privileges herein conveyed, revoked, by the city council of Iowa City, upon the failure of the said railway company, its successors or assigns, to comply with the terms or conditions herein; but no such action shall be taken or had until after thirty days' notice to said railway company, its successors or assigns, of such failure, and the refusal or right of said company, its successors or assigns to comply with said terms or conditions within thirty days thereafter."

Plaintiff railroad is the legal successor in interest and assignee of all the rights and properties of the Burlington, Cedar Rapids & Northern Railway Company. Ordinance no. 340 was never repealed. Plaintiff owned railroad tracks traversing South Market Square and used those tracks.

On June 3, 1937, John Nash, a wholesale grocer, leased from the railroad about 52 feet of the eastern-most usable portion of South Market Square. This leasing is hereinafter referred to as the railroad-Nash lease. The lease provided that the leased premises were to be used exclusively as a location for a warehouse for wholesale groceries. The city advised the railroad that it owned the property, so on August 27, 1937, a lease was entered into between the city and Nash, hereinafter referred to as the city-Nash lease. This lease is "for warehouse purposes and incidental uses," and provides: "Lessee shall have the right to erect the necessary buildings to use for warehouse purposes and incidental uses and shall have the right to remove the same whenever this lease is finally terminated." The lease also grants to the lessee an option to renew the lease for an additional 25 years upon the same terms and conditions at the expiration of the initial 25-year period provided for in the lease.

Nash built and operated a grocery warehouse on the premises he leased. He paid $50 a year rent, but he testified that he does not recall whether he paid the rent to the city or to the railroad.

In 1946 the city and the trustees of the railroad entered into an agreement providing for the division of South Market Square between the parties by exchange of quitclaim deeds to the east and west halves thereof, and pursuant to that agreement the railroad conveyed by quitclaim deed to the city the west 160 feet of South Market Square and the city conveyed by quitclaim deed to the railroad the east 160 feet of South Market Square. Shortly thereafter, the city assigned to the railroad its interest as lessor under the city-Nash lease.

In 1961 Nash assigned to Eljon, Inc., his interest as lessee under the city-Nash lease. The assignment recites that Nash would exercise the 25-year renewal option, and this apparently was done. From 1965 to September 1, 1973, the warehouse building on the leased premises was subleased to the United States Post Office.

In 1968 the city took possession of the east half of South Market Square (except the warehouse building) and has retained possession continuously to the present. This possession by the city has never been acquiesced in by the railroad. The city used the property for parking.

In November of 1973 Nash and Eljon, Inc., assigned to the city the lessee's interest in the city-Nash lease.

In the summer of 1974, the city tore down the warehouse building.

Since taking possession of the east half of South Market Square, the city has removed therefrom railroad tracks and ties, paved a substantial portion thereof with asphalt, and installed parking meters.

Under date of October 29, 1975, the railroad notified the city that it considered the city to be in default on the city-Nash lease and that the lease would

be cancelled within ten days from the mailing of the letter. Under date of January 12, 1976, the railroad wrote to the city reiterating that the leasehold interest of the city was terminated as of November 8, 1975, reciting the land's development as a municipal parking lot, a use inconsistent with the original lease terms, and reciting "radical changes made to the property without the consent of the Rock Island Railroad."

This lawsuit was commenced October 10, 1974.

The trial court found for the railroad, and upheld its title to the east half of the square and its easement on the west half where its tracks had run. The city was found to be the lessee under the city-Nash lease under its assignment from Nash and Eljon, Inc., but the lease was held terminated on November 10, 1975. The railroad was awarded immediate possession of the entire east half of the square. Damages were allowed for use of that area, less the leasehold, from October 10, 1969, to November 10, 1975, and for use of the whole east half of the square from November 10, 1975, to October 31, 1978, the date of the judgment.

The damages, computed according to the property's fair rental value, amounted to $107,106.10, plus statutory interest and costs. The city was found justified in removing the warehouse. The trial court found that the railroad failed to prove any damages resulted from the removal of the tracks. Also, although the city's affirmative defenses were refused, it was allowed a setoff of $23,000 for its permanent improvement to the lot.

■ I. We should first review the trial court's conclusion that the city-Nash lease was valid and subsisting until November 10, 1975. This ruling is challenged by the railroad on cross-appeal. The railroad argues that in 1937, when the city-Nash lease was executed, the railroad held the sold possessory interest in the property because of ordinance 340. Hence, the railroad argues, the city had no power to grant the leasehold purportedly created.

The city, in support of the trial court's holding, contends that ordinance 340 conveyed to the railroad a franchise, amounting to a mere incorporeal hereditament. Because only a franchise was granted, the argument continues, it did not amount to an easement that was an alienable interest in realty. The railroad counters by pointing to language in ordinance 340, "granting the right of way . . . ."

It is obvious that the argument on this issue turns on the granting authority of the city at the time ordinance 340 was adopted. We agree with the trial court, and the city, that the city, for lack of power to do so, did not grant an easement by ordinance 340.

The ordinance was adopted long prior to the advent in 1968 of the Iowa municipal home rule amendment. Iowa Const. amend. XXV. Prior to that time municipalities enjoyed only such powers as were specifically accorded them by the general assembly. The home rule amendment reversed this principle and granted municipalities those powers and authorities, except for tax-levying authority, which were not inconsistent with the laws of the general assembly. *Green v. City of Cascade*, 231 N.W.2d 882, 885 (Iowa 1975).

Under the law then in effect the authority of a municipality to grant even a franchise for railroad purposes was often disputed. Power to grant a franchise for railroad purposes in city streets was originally not accorded Iowa municipalities but was later given by statute. It took this later express statutory authority to make valid the granting of such a franchise. *State v. Railway*, 159 Iowa 259, 282, 140 N.W. 437, 447 (1913).

■ In the present case it is not necessary to resolve the question of whether the city had authority to grant a franchise. A franchise is not an alienable possessory interest. 37 C.J.S. Franchises § 8 at 152; 36 Am.Jur.2d, Franchises, § 2. In any event, the city lacked authority to grant an easement. Since the railroad's position on this issue is anchored to the city's authority to grant an easement and not a mere franchise, it follows that the trial court did not

err in finding that the city-Nash lease was valid and subsisting until November 10, 1975.

■ II. As stated, the city quitclaimed the east half of the square to the railroad in the property division of 1946.[1] The city nevertheless took physical possession of it in 1968, and used it for a parking lot. In connection with this use a railroad spur and the warehouse were removed. The city asserts its right to possession of this tract was bolstered in November 1973 when Nash and Eljon, Inc., assigned to it the lessee's interest in the city-Nash lease. The city may look to the city-Nash lease, and not the railroad-Nash lease, because, as we have seen, at the time the leases to Nash were made the railroad did not have sufficient possessory interest to stand as lessor. Under the renewal option the city-Nash lease extends to August 27, 1987.

The trial court ruled the city's right of possession as lessee did exist but ended November 10, 1975, when the lease was terminated by the railroad on the ground the premises were no longer being used for warehouse purposes. The city argues on two grounds it was error to find the lease was thus terminated.

First the city argues that the warehouse provision in the lease was permissive and not restrictive, relying on *Chamberlain v. Brown*, 141 Iowa 540, 546–49, 120 N.W. 334, 337–38 (1909). The railroad insists the warehouse provision was restrictive, not merely permissive, and that the lease could be, and was terminated when the property was no longer used for warehouse purposes, relying on *Kraft v. Welch*, 112 Iowa 695, 696, 84 N.W. 908 (1901). We agree with the trial court that the city can claim as lessee under the city-Nash lease. But we disagree that the interest was terminated on November 10, 1975, because the property was no longer used for warehouse purposes.

It is important that the city claims through the city-Nash lease and not through the railroad-Nash lease. Both leases were executed in 1937, nine years before the railroad acquired the east half of the square by the exchange of quitclaim deeds in 1946. At that time the city, not the railroad, held the lessor's interest in the property.

Language in the city-Nash lease referred to the use of the property in these words:

The said real estate has been leased by the lessor to lessee for warehouse purposes and incidental uses. Lessee shall have the right to erect the necessary buildings to use for warehouse purposes and incidental uses and shall have the right to remove the same whenever this lease is finally terminated.

It is significant that the lease here contains no words expressly limiting the property's use to the purpose mentioned, as in *McSweyn v. Inter-Urban Ry. Co.*, 256 Iowa 1140, 1145, 130 N.W.2d 445, 447 (1964), ("to use said land for electric railway only"). Here the language can scarcely be considered a covenant to maintain a warehouse. *See generally* 52A C.J.S. Landlord and Tenant § 718(a); 49 Am.Jur.2d, Landlord and Tenant, § 1078.

The city-Nash lease contained no forfeiture provision regarding use of the premises though, significantly, it did for nonpayment of rent.

We agree with the city that the city-Nash lease did not terminate on November 10, 1975, by reason of cessation of the warehouse operation.

■ III. The city-Nash lease provided for nominal rent of $50 annually and provided: "Failure to pay the rent promptly as agreed entitles lessor to cancel this lease by giving ten days' written notice and upon cancellation lessee shall be entitled to a reasonable time in which to remove buildings and property from premises." It is agreed that the city paid no rent from 1969 until the railroad sent a notice of termina-

1. In return the railroad quitclaimed the west half of the square to the city. By this deed the railroad abandoned its track easement over the west half. Notwithstanding limitations on the city's powers at the time, it did have statutory authority to deed the property to the railroad. § 403.11, The Code 1946. The parties do not dispute the question on appeal.

tion in 1975. Upon receiving this notice the city at once tendered the rent due but the railroad refused to accept it as rental payment.

The provision in this lease is to be contrasted with one which provides for automatic cancellation of the lease on non-payment of rent. *See Vincent v. Kaser Const. Co.*, 255 Iowa 1141, 1144, 125 N.W.2d 608, 609 (1964). We think it is apparent that the provision in the lease for ten days' notice of cancellation for nonpayment of rent carried with it the right of the lessee to cure the default by tender within that ten-day period. *See* 51 C.J.S. Landlord and Tenant § 114(2).

Since the city complied with the lease, or attempted to, upon notice of cancellation there is no entitlement to cancellation.

■ IV. The city-Nash lease entitles the city to only a part of the east half of South Market Square. As to that part of the tract not covered by the city-Nash lease it becomes necessary to consider the city's claim that the railroad should be barred from recovery by reason of laches. We believe the trial court was correct in rejecting this assertion.

■ Generally forfeitures are not favored either in law or equity. *Lovlie v. Plumb*, 250 N.W.2d 56, 63 (Iowa 1977); *Collins v. Isaacson*, 261 Iowa 1236, 1242, 158 N.W.2d 14, 17–18 (1968). Laches is an affirmative defense which must be established by clear, convincing, and satisfactory proof. *Moser v. Thorp Sales Corp.*, 256 N.W.2d 900, 908 (Iowa 1977). It is available only when delay has harmed the claimant or caused material prejudice. *Davidson v. Van Lengen*, 266 N.W.2d 436, 439 (Iowa 1978).

There is no clear, convincing, and satisfactory proof of laches here. The city's only construction on the site was a parking lot. The lot was built over most of the eastern half of the square soon after the city occupied the tract in 1968. The record is clear that the railroad protested when the city occupied the property and constructed the parking lot. The city was not in any

way damaged by the railroad's subsequent delay because the parking lot was already in existence. Laches does not appear.

■ V. Finally, the railroad on cross-appeal asserts the trial court erred in calculating interest on the rental damages. The trial court assessed interest at the statutory rate rather than the higher economic rate recommended by experts. There is no evidence of any written agreement between the parties with respect to interest, just as in *Olberding Const. Co., Inc. v. Ruden*, 243 N.W.2d 872, 879 (Iowa 1976). Hence the question is controlled by section 535.2(1)(b), The Code 1979. The assignment is without merit.

In summary:

(1) The railroad has no easement or other interest in the west half of South Market Square.

(2) The railroad owns the east half of South Market Square, subject to the city's rights under the city-Nash lease.

(3) The city-Nash lease was valid and governing. It was not breached under either a permissive or restrictive reading of the covenant of use. The lease was not abandoned or terminated for nonpayment of rent. The city may continue in possession of the property under the city-Nash lease until its termination.

The case must be remanded with instructions that the trial court determine what part of the $107,106.10 rental award is attributable to that part of the tract covered by the city-Nash lease and delete such amount from the rental award. Thereafter the trial court is directed to enter judgment in accordance with this opinion.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH INSTRUCTIONS.