# IN THE COURT OF APPEALS OF IOWA

No. 18-0730
Filed March 6, 2019


**REIFF FUNERAL HOMES, INC.,**
    Plaintiff-Appellee,

**vs.**

**ROBERT B. REIFF d/b/a REIFF FUNERAL HOME AND CREMATORY,**
    Defendant-Appellant.
_____


Appeal from the Iowa District Court for Dubuque County, Monica Zrinyi Wittig, Judge.


Robert Reiff, doing business as Reiff Funeral Home and Crematory, appeals from an adverse judgment entered in favor of Reiff Funeral Homes, Inc. **AFFIRMED.**


Erich D. Priebe and James H. Cook of Dutton, Braun, Staack & Hellman, P.L.C., Waterloo, for appellant.

Darin S. Harmon of Kintzinger Law Firm, P.L.C., Dubuque, for appellee.


Heard by Vogel, C.J., Vaitheswaran, J., and Gamble, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2019).

**GAMBLE, Senior Judge.**

Robert (Bobby) Reiff, doing business as Reiff Funeral Home and Crematory, appeals from an adverse judgment entered in favor of Reiff Funeral Homes, Inc. and its principal Joseph (Joe) Reiff in this common law trademark infringement suit.[1]  Bobby asserts the district court erred in concluding "Reiff Funeral Home" has a secondary meaning entitled to trademark protections and the plaintiff's case should be dismissed on the basis of laches.

We conclude Joe proved he had a valid trademark in the name of Reiff Funeral Home and Bobby infringed on that trademark.  Joe's trademark infringement claim ripened when Bobby used the internet to enter Joe's market.  Bobby failed to prove his equitable defense of laches.

**I. Background Facts and Proceedings.**

Reiff Funeral Homes began operating as a mortuary in 1959 under the care and administration of Robert W. (Robert) and Anna Mae Reiff.  It has physical facilities in Epworth, Farley, Dyersville, and Cascade and has provided funeral services in Dubuque, Jackson, Jones, Delaware, and Clayton counties.  Robert and Anna had ten children.  Their sons Bobby and Joe both obtained degrees in mortuary science and assisted Robert in the family business.

Sometime in the 1980s, Robert was diagnosed with cancer and made the decision with Anna to offer Reiff Funeral Homes to Joe and Bobby.  Joe was still working in the family business when the diagnosis was made.  Bobby had been living in the Fort Dodge area and working with Fort Dodge Area Funeral Service.

---

[1] Because the parties or their representatives share a last name, we will refer to the various Reiffs by their first names.

In 1984, Bobby moved to Independence to manage the Mason Funeral Chapel for Charles Dietman. "Within six months," Dietman approached Bobby and asked if the Reiff name could be "put on the building." The business was then called Mason and Reiff Funeral Chapel. The Mason name was later dropped "because there was no value of the Mason name" and the business was then called Reiff Funeral Chapel. Bobby purchased the business from Dietman in March 1986.

In early 1986, the families of Robert, Bobby, and Joe met with Robert's attorney John O'Connor at his law office in Dyersville and discussed options for the sale of the business. Robert wished each son to purchase two of the locations of Reiff Funeral Homes. Joe was interested in making the purchase along with his wife, Peggy. Bobby indicated he did not want anything to do with the "dead horses" and walked out of the meeting. After further discussions with Robert, Joe and Peggy decided to purchase the business and the buildings.

Attorney O'Connor drew up the purchase agreements for the sale of Reiff Funeral Homes. Pursuant to the bills of sale dated September 30, 1986, Joe and Peggy purchased the buildings and real estate located in Cascade, Dyersville, Epworth, and Farley; the name of the business, "Reiff Funeral Home"; and the goodwill associated with the business. Joe and Peggy filed articles of incorporation with the secretary of state on March 8, 1995, identifying the corporation as "Reiff Funeral Homes, Inc.," with Joe as the registered agent and Joe and Peggy as the only directors.[2]

---

[2] In 2016, a fictitious name "Reiff Funeral Home & Cremation Services" was registered along with Reiff Funeral Homes, Inc.

Reiff Funeral Chapel was not performing well at the inception of Bobby's ownership. Bobby testified no calls were received from March to June 1986. Bobby testified he and his father had a discussion about the business. Bobby thought the word "chapel" sounded cold. He stated the two of them had a long discussion and Robert suggested that Bobby use the name Reiff Funeral Home to bring in families that related to the Reiff name. Bobby stated he was concerned with encroaching on his father's business but Robert purportedly indicated it would bring a broader spectrum of people to the funeral home and would benefit both Bobby and Joe. Bobby claims Robert offered to provide a signed document allowing him to use the "Reiff Funeral Home" name but Bobby declined, explaining his father's word was enough. In the fall of 1986, a sign was erected at Bobby's Independence location identifying the business as "Reiff Funeral Home" with an insignia of the letter "R" printed in script with a circle around it. Advertisements were placed in the local papers that would be serviced by the business, including where it had physical locations—Winthrop, Quasqueton, and Independence—all being in Buchanan County. Bobby recognized the value of the name Reiff Funeral Home. As noted above, before he changed the name he was not getting calls. Bobby testified, "[W]e were just about on our last—last grasp [sic], when business started coming in." But, Bobby did not pay any consideration to Robert for the use of the name. Bobby did not incorporate his business or register a trade name.

Sometime in the 1990s after his father died, Joe became aware that Bobby was doing business as Reiff Funeral Home. This was a source of disagreement between the brothers, but they were still getting along and cooperating in their businesses. For example, in 2000, Bobby lost the building that housed the

Independence facility to a fire. In rebuilding, he decided to add a retort[3] and change the name to reflect the services he could now provide. Joe helped Bobby during the rebuilding process by allowing him to use blueprints from his Dyersville location, which included a sign with the name Reiff Funeral Home. Joe told Bobby, "[O]f course, that will have to change." After construction was complete, Bobby announced an open house in the name of "Reiff Funeral Home and Crematory" in June 2002.

Over the years, the brothers' relationship has deteriorated, partially as a result of the confusion related to their businesses. On April 11, 2008, Peggy sent Bobby an email informing him that he was not supposed to be using the name Reiff Funeral Home because she and Joe had purchased the rights to that name. Bobby denies receiving the email, claiming Peggy sent it to an old email address. However, it was not returned to Peggy undelivered.

There were several incidents of confusion. Joe was served with papers for a collection action on Bobby's delinquent business account. People sent money for prepaid planning services to Bobby when it was intended to be placed in Joe's control. When confronted, Bobby initially denied that the money had been sent to him and then, when pressed, verified he had the money. On one occasion, he refused to send the money to Joe until the attorney-in-fact for the person demanded the money be turned over to Joe.

The confusion escalated sometime around 2011 when Bobby put a website for his business on the internet. In addition to listing his locations in Buchanan

---

[3] A retort is the chamber where the cremation process takes place.

County, Joe advertised that he was proudly serving several communities in northeast Iowa including the Dubuque County communities where Joe's Reiff Funeral Homes were located. As a result, on-line obituaries have been difficult to find for the families and friends due to the wording placed into search engines on Google. When they are searching for Joe's business they end up on Bobby's website because his URL was [www.reifffuneralhome.com](www.reifffuneralhome.com).

Other examples of confusion included phone calls to Joe's business when the caller was looking for Bobby's and vice-versa. One caller indicated that Bobby told him the two businesses worked together and Bobby could assist with a pre-need contract. Supplies that had been ordered by Joe's business were erroneously sent to Bobby's business. When the supplier was asked about the discrepancy, it was verified that the items were sent to the wrong address. Joe's business ended up having to pay twice for the same products as Bobby did not call to have the items returned to the supplier nor did he call Joe to say the items were received in error. The logo for Joe's business is the scene of a park. When advertisements have been ordered by Joe's business, the printer indicated it could take the logo off the web site for publication—the printer used Bobby's insignia instead of Joe's park scene.

For several years, Joe has asked that Bobby desist in using the name that Joe purchased from his father. Bobby has continued to use the name. Joe testified, "I was trying to keep family peace, and trying to make this work, but as the years went on, it kept getting confusing, and the more he put on his website, indicating he serviced the area, everything just kept snowballing, and I couldn't reason with him."

Reiff Funeral Homes, Inc. filed suit on December 1, 2016, alleging Bobby had infringed upon its trademark "by marking their products and services under a similar designation that will cause a likelihood of confusion among customers." Joe sought an injunction against Bobby's use of the name Reiff Funeral Home. Bobby denied Joe's trademark infringement claim and asserted the affirmative defense of laches.

On December 27, 2016, Bobby incorporated and registered "Reiff Funeral Home & Crematory, Inc." with the secretary of state.

A bench trial was held on February 27, 2018, and on March 1, the trial court issued its written judgment. The trial court concluded "*Reiff Funeral Home* is a trademark that was associated with Robert W. Reiff and his wife Anna Mae Reiff in the business they created in 1959." The court found:

> [Robert and Anna] fostered their business with great care. The name and its business reputation spanned four counties even before such a thing as the internet existed. Robert and Anna Mae owned four buildings in which they counseled and compassionately cared for people in the state of extreme grief, either from the preparation of a pre-need plan, or a need from a relative's recent death. The name was used continuously for over [thirty] years by them and had a reputation concerning the business affairs. Their sons worked in the business and knew of the efforts their parents put into the services provided to the community. Robert's business savvy, his concern for his reputation, his desire to have the business perpetuate and his desire to have this name maintain its goodwill in the community were all evidenced by the agreement he entered into with his son Joe. When Robert was diagnosed with cancer, he attempted to pass this important part of his family's life to his sons, but Bobby wanted nothing to do with it. Bobby knew what the intentions of his father were relating to the Reiff Funeral Home. Despite having a skill in the mortuary sciences that was fostered in his father's business, he chose to go out on his own. The name has taken on a secondary meaning in the business. Bobby has now infringed on his father's name and his brother's right to use it.

The trial court specifically found Bobby was not credible when he asserted his father told him to use the name Reiff Funeral Home or when Bobby stated Robert thought his use of the name was beneficial to both brothers.

The trial court determined the public's confusion worsened with the growth of internet use, and the "most significant evidence of confusion" is shown on the website and the domain name chosen by Bobby—www.reifffuneralhome.com. The court noted a search with Google results in references to both businesses. The trial court wrote: "When three unrelated incidents occurred that ended up benefitting Bobby and he did nothing to correct the circumstances as soon as he could, and without prompting, he showed his real character."[4] The court concluded, "One could infer, and others have inferred the businesses are one and the same."

The trial court ordered Bobby to cease using the trademark Reiff Funeral Homes. The court rejected Bobby's requests to reconsider and to find Joe's claims precluded by the doctrine of laches—the court determined the doctrine was not applicable because Bobby did not come to court with clean hands.

Bobby now appeals.

## II. Scope and Standard of Review.

This action was tried in equity, and our review is therefore de novo. Iowa R. App. 6.907. We give weight to the trial court's findings, particularly as they

---

[4] The three instances were: (1) Bobby specifically told a woman he was affiliated with Joe when she was seeking out a pre-need plan for cremation. (2) Bobby kept funds that were intended to be entrusted to Joe for a pre-need plan. Joe had to take more than ordinary steps to verify the funds were in Bobby's hands and then have the money transferred to satisfy a customer's plan. (3) Lastly, Bobby allowed products to be delivered to his business that were ordered by Joe, retained the product, and never paid for it—all to his brother's detriment.

relate to the credibility of the witnesses, but are not bound by them. Iowa R. App. P. 6.904(3)(g).

### III. Discussion.

"Trademarks are words, names, or symbols used to identify a person's goods or services and distinguish them from those of another."[5] *Cmty. State Bank, Nat'l Ass'n v. Cmty. State Bank*, 758 N.W.2d 520, 524 (Iowa 2008). A trademark is a common-law property right; therefore, registration "is not a prerequisite to protection from infringement." *Commercial Sav. Bank v. Hawkeye Fed. Sav. Bank*, 592 N.W.2d 321, 327 (Iowa 1999).

> "Trademarks perform the important economic function of identifying the products of one business and distinguishing them from those of its competitors." [William C. Holmes, 1 Intellectual Property & Antitrust Law], § 3.01, at 3–3 [(1998).] Trademark infringement is considered a form of unfair competition because the similarity in the marks could lead a prospective buyer to believe that defendant's goods are those of the plaintiff. *See* Rudolf Callmann, 3A The Law of Unfair Competition, Trademarks & Monopolies § 20.02, at 9 (4th ed. 1988). Thus, potential customers may be attracted to the reputation and name built up by the first user. *Id.* § 20.12, at 80. The danger is not that the sophisticated buyer will actually purchase from the defendant/second user believing that he has purchased from plaintiff/first user, but rather that the purchaser will be misled into an *initial* interest in defendant based on a mistaken belief as to a potential interrelationship between the two businesses. *Id.* § 20.03, at 12. In such cases, a defendant should not be permitted to benefit or trade upon any misleading suggestion of a relationship with the plaintiff's business or products. *Id.* § 20.04, at 20. . . . The justification for an injunction is that the plaintiff, as owner of the infringed trademark, is entitled to insist that its reputation shall be of its own making alone and that quality of its products or services lies within its exclusive control. *Id.* § 20.04, at 21. Thus, "'[w]hat is infringed is the right of the public to be free of confusion and the

---

[5] "Trademarks are signs or symbols used to identify goods (referred to as trademarks) or services (referred to as service marks)." *Pundzak, Inc. v. Cook,* 500 N.W.2d 424, 430 (Iowa 1993). The mark at issue here would appear more properly referred to as a service mark. However, because the parties and the trial court refer to it as a trademark, we will do so as well.

synonymous right of a trademark owner to control [its] product's reputation.'"

*Id.*

"To succeed on a common-law trademark infringement claim and to obtain injunctive relief, a plaintiff must prove (1) that it has a *valid trademark* or a protectable proprietary right in the name it seeks to exclude others from using, and (2) that there has been *infringement* of that right." *Id.* at 326.

*A. Valid trademark.* "In order to demonstrate the existence of a valid trademark, 'the plaintiff must prove that there has been *use* of a name or designation that is sufficiently *distinctive* such that customers (i.e. customers and potential customers) identify the mark with the goods or services provided by the [plaintiff].'" *Cmty. State Bank*, 758 N.W.2d at 525 (alteration in original) (citation omitted).

> In determining whether a name is sufficiently distinctive, courts classify the alleged trademark into one of four categories: (1) generic, (2) descriptive, (3) suggestive, or (4) arbitrary or fanciful. Generic designations are words that are of a general type of goods or services and are not entitled to protection under trademark law. Descriptive designations are "merely descriptive of the nature, qualities, or other characteristics of the goods, services, or business with which it is used." . . .
>     Descriptive designations are not inherently distinctive and can only be protected under trademark law if the term has acquired secondary meaning. Secondary meaning attaches to a descriptive designation when the term has become "uniquely associated" with the product or service, in that, "as a result of its use, prospective purchasers have come to perceive it as a designation that identifies [the specific] goods, services, [or] business[ ]." In order to establish secondary meaning, the plaintiff must demonstrate the public understands its name to represent its goods or services. A plaintiff can establish secondary meaning with direct or circumstantial evidence, such as consumer testimony and surveys, proof of actual consumer confusion, exclusivity of use, advertising and promotional efforts, and market share.

*Id.* (alteration in original) (citations omitted).

Bobby argues he has the right to use his name in his business and "funeral home" is a generic term that cannot be afforded trademark protection. Joe contends the business name Reiff Funeral Home[6] has acquired secondary meaning protected by trademark law. We conclude Joe has the stronger claim.

The trial court acknowledged a person has a right to use their own name in their business. *See Brown Garage Co. v. Brown Auto & Supply Co.*, 195 N.W. 514, 515 (Iowa 1923) ("The plaintiff quite concedes the general rule that every person has a right to use his own name in his own business, provided that it is done honestly and without ulterior purpose to deceive the public, and thereby to divert the trade intended for his competitor."). Nonetheless, the trial court found "Reiff Funeral Home" to be a descriptive designation[7] that had attained a secondary meaning, i.e., the public understood the designation to be funeral services uniquely associated with the Robert and Anne Reiff family and as purchased by Joe. Here, the court correctly concluded the trademark Reiff Funeral Home "is a valuable proprietary right associated with the business [Joe and Peggy]

---

[6] On appeal, Joe asserts the trademark covers the business name "Reiff Funeral Home and Crematory." However, this is not the mark the district court found protected and there was no cross-appeal. We limit our discussion to the district court's finding and ruling.

[7] As noted by the trial court,

> If Joe and Bobby were operating two businesses such as a funeral home where funeral services were hosted, and a crematory where bodies were prepared for funeral services, and used the names that relate to their specific services, the court would have no issue to decide here. Persons looking for a place to have a service would know to go to Reiff Funeral Home. Persons looking for the preparation of a body would know to go to Reiff Crematory. But both Joe and Bobby using the same words are confusing to businesses dealing in the industry, persons seeking to prepare for a death, persons looking for where services are being held, persons seeking information about obituaries and the community in general.

purchased from Robert W. and Anna Mae Reiff." *See Dyment v. Lewis*, 123 N.W. 244, 245 (Iowa 1909).

There is substantial support for the court's finding that the Reiff Funeral Home has attained a secondary meaning. We specifically note Bobby's own testimony that Dietman approached Bobby and asked if the Reiff name could be "put on the building" of the Mason Funeral Chapel. Bobby testified the name Mason had no value. It is clear the Reiff name did, especially when used in conjunction with "Funeral Home." Again, we point to Bobby's own testimony concerning changing the name of the Independence business from Mason Funeral Chapel, to Mason and Reiff Funeral Chapel, to Reiff Funeral Home. If it was simply the Reiff name that was of value, what incentive did Bobby have to change Reiff Funeral Chapel to Reiff Funeral Home? *See Red Polled Cattle Club of Am. v. Red Polled Cattle Club of Am.*, 78 N.W. 803, 805 (Iowa 1899) ("The defendants, having legally incorporated in Iowa, certainly have a right to their corporate name in so far as they may not injure plaintiff by so doing. Whether the name in question is of a character to properly constitute a trade–mark or trade–name, I need not consider. When defendants chose it, they did so with full knowledge of the fact that plaintiff had already adopted it and was doing business under it. That the name is of a pecuniary value is sufficiently shown by the facts that defendants selected it, though free to take any name they chose, and now make such strenuous efforts to continue its use.").

We agree with the trial court that Bobby used the Reiff Funeral Home designation because "Bobby was riding on the coattails of his brother's solid reputation that had been enhanced from their father's savvy business plan." *See*

*Sartor v. Schaden*, 101 N.W. 511, 513 (Iowa 1904) ("[The name] had acquired in the locality in which plaintiff did business a peculiar secondary meaning, and stood for a brand of cigars made by the plaintiff, upon which he had built up a large trade. Defendant had no right to palm off his goods as those made by the plaintiff, or to so use the label adopted by plaintiff as to deceive purchasers who wished to purchase plaintiff's goods. Plaintiff had gone to large expense in building up his trade on these particular cigars, and is entitled to be protected therein."). We give great weight to the trial court's assessment that Bobby's testimony lacked credibility when he testified his father agreed that he could use the mark. *See Soults Farms, Inc. v. Schafer*, 797 N.W.2d 92, 97 (Iowa 2011). We note that Bobby's testimony was contradicted by the testimony of his sister, Beatrice Willenbring.

*B. Infringement.* A trademark has been infringed when the defendant's use of a similar designation will cause a likelihood of confusion among customers. *See Cmty. State Bank*, 758 N.W.2d at 527; *see also* Restatement (Third) of Unfair Competition § 20 (1995). "Demonstrating actual or potential economic injury is not necessary to find infringement." *Cmty. State Bank*, 758 N.W.2d at 527. Because "a trademark represents intangible assets such as reputation and goodwill, a showing of irreparable injury can be satisfied if it appears that [the plaintiff] can demonstrate a likelihood of consumer confusion." *Gen. Mills, Inc. v. Kellogg Co.*, 824 F.2d 622, 625 (8th Cir.1987); *see also Cmty. State Bank*, 758 N.W.2d at 527 (citing *Gen. Mills, Inc.*, 824 N.W.2d at 625).

We conclude Joe established Bobby infringed upon the Reiff Funeral Home trademark. Both Bobby and Joe testified as to the importance of location in the

funeral business. For about thirty years, Robert and Anne operated primarily in and around Dubuque County. Bobby moved to Fort Dodge (Webster County) and performed similar services and then moved to Buchanan County, where he purchased an existing business. While the early years of Bobby's use may have gone less noticed because of the geographical separation of the funeral operations, infringement became evident due to the growth of internet advertising and the public's dependence on the internet. Joe, Peggy, and Bobby all testified about instances of the public's confusion. And we can infer that confusion was contemplated and perhaps intended by Bobby.

Joe's website identifies that he serves the communities where he owns an actual facility and the surrounding communities. Bobby's website identified every small city and the seven counties surrounding his Buchanan County facilities.[8] Bobby testified this was due to a "three-tier" thought process on his part:

> One, staying in the spirit of what my father asked me to do, and— and to help the brother out, when possible. Um, so it's in the spirit of it, it was—when that we advertise now, to drive the people to the Reiff name. It's the Reiff name they're looking for, you know. And to drive them to the Reiff name, and we would sort it out, between— hopefully between the two of us, in a fair and equitable manner, that we get the people where they want to go.

---

[8] The website notes the physical facilities in Independence, Winthrop, and Quasqueton but adds:

> Proudly Serving the Communities of Independence, Rowley, Hazelton, Jesup, Fairbank, Oelwein, Walker, Quasqueton, Winthrop, Lamont, Aurora, Urbana, Troy Mills, Monti, Masonville, Littleton, LaPorte City, Waterloo, Cedar Rapids, Raymond, Gilbertville, Manchester, Earlville, Dundee, Strawberry Point, Denver, Hudson, Vinton, Urbana [duplicated], Center Point, Hiawatha, Coggon, Central City, Ryan, Dewar, Fayette, **Farley, Dyersville, Epworth, Cascade**, New Vienna, Holy Cross, Buena Vista, Balltown, Peosta, Bernard, Grundy Center, Shellsburg, VanHorn, **Dubuque County**, Buchanan County, Delaware County, Black Hawk County, Linn County, Fayette County, Clayton County, Grundy County, Iowa.

(Emphasis added.)

I—I think if you asked Joe and then asked me, it's not about us. It's about what the family needs to get through this grieving process, and we're—we're going to do whatever it takes to help them through that. All right? And so it's just, free advertising.

Two, the second prong of that is, um, at the time, when we adopted that website, we had a website prior to that, but we switched over to this company, because I simply love the website, um, was, at the time, is I was representing a national group called International Trade Services, which is a national trade service to help funeral homes out. Ship bodies back to where they need to be back to, to where the family's residence was. And I had covered everything from, um, the Mississippi River down Interstate 80, Interstate 35, whole Northeast Iowa, and I traveled the whole Northeast Iowa over the years that I've represented the group, the national group. And simply what I would do is pick the body up, do the paperwork necessary to get the body down to, what I call to the Des Moines International Airport, and fly them out to wherever they need to go. All right. And—and the like.

And the third one is, is the fact that we own a crematory. It's in-house. We don't have anything else. And as a consumer, it's less expensive to go direct to a crematory than to go to a funeral home, because there's additional charges, if you don't have to. You're arranging for cremation services. They're not actually performing them, where we are actually performing them. We are certified funeral directors who are also certified crematory operators, and, um, um, so it's less expensive for the families.

So, in some ways, I have an ethical responsibility to let people know that that option is there. I'm not trying to take business away from Joe, but we try to—to, um, elaborate with these people that we need to let them know they're out of the price range, they're out of the area.

We note this testimony contradicts Bobby's earlier affidavit, "Although I expanded my locations over the ensuing years, all of my advertising efforts have been intended solely to foster business at my own service locations."

*C. Laches.* Bobby argues Joe's thirty-year delay in litigating this dispute has caused him substantial prejudice and Joe's trademark-infringement claim should be estopped because of the delay in bringing suit. "Laches is an equitable doctrine premised on unreasonable delay in asserting a right, which causes disadvantage or prejudice to another. The party asserting the defense has the

burden to establish all the essential elements thereof by clear, convincing, and satisfactory evidence." *Markey v. Carney*, 705 N.W.2d 13, 22 (Iowa 2005) (quoting *State ex rel. Holleman v. Stafford*, 584 N.W.2d 242, 245 (Iowa 1998)).

Bobby argues that Joe's claim is beyond any statute of limitations and is subject to the defense of laches. In Iowa, trademark infringement is an equitable action. *Cmty. State Bank*, 758 N.W.2d at 524. There is no specific statute of limitations on trademark infringement. *See* Iowa Code § 614.1 (2010). Joe's claim is arguably outside the analogous five-year limitations period "for relief on the ground of fraud in cases heretofore solely cognizable in a court of chancery, and all other actions not otherwise provided for in this respect." *Id.* § 614.1(4). Bobby put his website on the internet sometime around 2011, and customer confusion escalated after that. It is unclear whether Joe was within this analogous five-year limitations period when he filed his lawsuit on December 1, 2016. Nevertheless, we conclude the defense of laches applies and Bobby has the burden to prove that Joe unreasonably delayed filing suit to his detriment.[9]

Bobby cannot establish by clear and convincing evidence that Joe unreasonably delayed in asserting the claim of trademark infringement. The delay was largely due to the increasing confusion tied to the rise of the importance of the internet. The concept of "local" has been expanded exponentially by the reach of the internet. *See Sartor*, 101 N.W. at 513-14 (rejecting claim of laches and noting "[t]he use of the word in other states or in other parts of this state by persons who

---

[9] *Moser v. Thorp Sales Corp.*, 256 N.W.2d 900, 908 (Iowa 1977) ("Ordinarily laches cannot be claimed against one bringing an action within the statute of limitations, absent some special detriment to another.").

did not compete with plaintiff is not controlling" as "[t]here cannot be unfair trade unless there be competition, and in many cases, if not in most, this competition is of necessity local"). Joe delayed filing suit in an effort to keep peace in the family and to continue trying to work things out with Bobby. From time to time over the years, Joe told Bobby he would need to change the name of his business and complained that Bobby was using the Reiff Funeral Home name without paying for it. However, Bobby's interference with the trademark became more and more evident and time went on. It snowballed when Bobby put his website on the internet. This change in circumstances is relevant in determining whether the delay was unreasonable. *See Thurn v. Thurn*, 310 N.W.2d 539, 540 (Iowa Ct. App. 1981) ("Although Doris did not attempt to enforce her judgment for twenty-two years, she apparently did not do so because she knew that Victor's financial circumstances remained limited; she sought a general execution for back payments as soon as she learned that his situation had changed. For these reasons, we do not view her delay in asserting her rights as unreasonable."). Joe's trademark infringement claim ripened when Bobby used the internet to enter Joe's market resulting in greater customer confusion. We conclude under the evolving circumstances of this case, Joe's delay in asserting his trademark infringement claim was not unreasonable.

Nor do we find that Bobby proved by clear, convincing, and satisfactory evidence that he has been prejudiced by the delay. Bobby claims Joe's thirty-year delay put his career-long investment in "Reiff Funeral Home" at risk. Bobby asserts his prejudice increases as time passes. However, prejudice cannot be inferred from the mere passage of time. *Anita Valley, Inc. v. Bagley*, 279 N.W.2d 37, 41

(Iowa 1979). Laches applies if the defendant has changed his position in a manner that would not have occurred but for the plaintiff's delay. *Markey*, 705 N.W.2d at 23. Bobby did not change his position because of Joe's delay. *See Chicago, Rock Island & Pac. R.R. Co. v. City of Iowa City*, 288 N.W.2d 536, 541 (Iowa 1980) ("[T]he railroad protested when the city occupied the property and constructed the parking lot. The city was not in any way damaged by the railroad's subsequent delay because the parking lot was already in existence."). Rather, for many years, over Joe's protest, Bobby has been able to reap the benefits of using the moniker he found beneficial enough to adopt but refused to purchase from his father. *See Markey*, 705 N.W.2d at 22 ("Further, a party cannot assert the defense of laches if he or she actually benefited from the delay."). Bobby cannot claim prejudice resulting from his own wrongful conduct.

Further, Bobby failed to prove evidentiary prejudice. *See Moody v. Christiansen*, 306 N.W.2d 775, 777-78 (Iowa 1981). By the time Joe's trademark infringement claim ripened due to Bobby's use of the internet to expand into Joe's market, Robert was dead and would not be available to either corroborate or contradict Bobby's testimony.

The doctrine of laches applies only where it would be inequitable to allow a person making a belated claim to prevail. *In re Marriage of Leege*, 494 N.W.2d 453, 456 (Iowa Ct. App. 1992). In this case, it would be inequitable not to allow Joe to prevail on his trademark infringement claim.

**IV. Conclusion.**

We conclude Joe proved he had a valid trademark in the name of Reiff Funeral Home and Bobby infringed on that trademark. Joe's trademark

infringement claim ripened when Bobby used the internet to enter Joe's market. Bobby failed to prove his equitable defense of laches. Accordingly, we affirm the decision of the district court.

**AFFIRMED.**